Filed 7/7/11

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,                )

                      )

        Plaintiff and Respondent,   )

                      )            S064306

        v.                  )

                      )

JOHN JOSEPH FAMALARO,     )        Orange County

                      )   Super. Ct. No. 94ZF 0196

        Defendant and Appellant.   )

_____)

A jury found defendant John Joseph Famalaro guilty of the first degree murder of Denise Huber. (Pen. Code, §§ 187, 189.)[1] It found true special circumstance allegations that her murder was committed while defendant was engaged in kidnapping (§ 190.2, former subd. (a)(17)(ii), now § 190.2, subd. (a)(17)(B)) and in the commission or attempted commission of sodomy (§ 190.2, former subd. (a)(17)(iv), now § 190.2, subd. (a)(17)(D)). At the trial's penalty phase, the jury returned a verdict of death. The trial court denied defendant's motion for a new trial (§ 1181) as well as the automatic application to modify the penalty (§ 190.4, subd. (e)), and it sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

## A. Guilt Phase

### 1. Prosecution's case

#### a. The disappearance of Denise Huber: June 1991

On the evening of June 2, 1991, 23-year-old Denise Huber left her parents' home in Newport Beach and drove to Huntington Beach to pick up a friend, Robert Calvert. Denise had two tickets for a popular music concert that night in Inglewood, but her boyfriend, Steven Horrocks, could not accompany her. Horrocks asked his friend Calvert to go with Denise to the concert.

After picking up Calvert, Denise drove to the concert parking lot, where they drank vodka and orange juice before the show. During the concert, they shared a 20-ounce cup of beer. After the concert, Denise and Calvert drove to a restaurant-bar in Long Beach, where Denise had two more glasses of beer. They stayed until closing time, between 1:30 and 2:00 a.m. Denise then drove Calvert home to Huntington Beach, dropping him off at 2:05 a.m.

According to Calvert, Denise did not appear intoxicated when he last saw her. He described her as "attractive" and "very dressed up," wearing a jacket and a dark dress with black stockings and high heels. While he was with Denise, he did not notice her having any problems with the heels of her shoes.

Denise never returned home. The next morning, on June 3, 1991, Denise's mother, Ione Huber, called Tammy Brown, one of Denise's best friends, to ask if she knew where Denise was. Brown made a few phone calls, spoke with Calvert, and decided to drive around to look for Denise's Honda automobile. About 10:00 p.m. that night, Brown spotted the car, which had a flat tire, parked on the shoulder of southbound Highway 73, just before the exit to Newport Beach.

Brown telephoned Denise's parents, who drove to the scene and inspected the car. It was unlocked and Denise's keys were not inside.

The flat tire on Denise's car had left skid marks on the freeway. The area where the car had been found was well lit at night and several emergency call boxes were visible nearby. The chain-link fence that bordered the freeway near the car had an opening that led down a gravel slope to an adjacent city street, near gas stations, restaurants, pay telephones, and a hotel.

### b. The discovery of Denise's body: July 1994

Over three years later, on the morning of July 13, 1994, Yavapai County (Arizona) Deputy Sheriff Joseph Michael DiGiacomo received a radio call about a possible stolen truck parked outside a house in a small high desert community in Dewey, Arizona. When he arrived at the house, Deputy DiGiacomo found backed into the driveway a 24-foot rental truck with a vehicle identification number that matched a report of a truck stolen from Orange County, California six months earlier.

Deputy DiGiacomo conducted an inventory of the truck's contents in preparation for confiscating the truck and having it towed it away. The truck was locked, but he noticed that a power cord ran into the rear of the truck under the back door. The other end of the cord ran over a fence and into the backyard of the house. Deputy DiGiacomo called a locksmith, who unlocked the padlock on the truck's back door. The truck contained paint cans and painting equipment, and the power cord ran to a running freezer at the back of the truck, which was locked and sealed with masking tape.

Believing he had stumbled onto a mobile drug lab, Deputy DiGiacomo called local narcotics officers to assist him. After the narcotics investigators arrived, the locksmith unlocked the freezer. When they cut through the tape and

3

opened the freezer, it emitted a foul odor. One of the investigators reached into the freezer and felt what he thought was a human shoulder. Deputy DiGiacomo sealed off the truck and called Scott Mascher, Lieutenant Supervisor of the Homicide and Major Crimes unit of the Yavapai County's Sheriff's Department.

Lieutenant Mascher opened the freezer and saw that it contained something wrapped in a black trash bag as well as bodily fluids that had became frozen at the bottom of the freezer. The bag had frost and ice crystals that were consistent with having been in the freezer for a long time. After cutting through three layers of trash bags, Lieutenant Mascher found a naked human body, frozen solid in a fetal position with the hands secured behind the back with metal handcuffs. Finding no identifying information for the body and no signs that the person had been killed in the freezer, Lieutenant Mascher sealed the freezer and the truck and had everything towed to forensic pathologists in Phoenix, Arizona.

     *c. The examination and identification of the body*

Dr. Ann Bucholtz, a medical examiner in Phoenix, conducted the external examination and autopsy of the body. The body and the plastic bags were stuck to the bottom of the freezer in a frozen layer of fluid.

To prevent the loss of any evidence of sexual assault during the thawing, Dr. Bucholtz first collected samples from the body's mouth and from the anal openings, and, after using a hair dryer to thaw portions of the legs, from the vaginal area. The body's head had been wrapped with three white kitchen garbage bags. Grey tape covered the face from the mouth to the upper eyelids. The head had numerous external injuries and the mouth had been plugged with a wadded cloth gag that had fallen out during the thawing. The handcuffs around the wrists were so tight that Dr. Bucholtz could not slip her fingers beneath them, so she removed them with bolt cutters. She then took fingerprints from the hands, which

4

were later matched to fingerprints that had been taken for Denise's California driver's license. Two days later, the body had thawed sufficiently that Dr. Bucholtz was able to collect internal swabs of the vagina and rectum.

Dr. Bucholtz described Denise's skull as "basically shattered." There were numerous curved and oval-shaped fractures and lacerations, and brain tissue was visible through some of them. In some of these indentations were embedded pieces of the white plastic bags that had been wrapped around Denise's head; the pieces matched slit-like tears in the bags. Dr. Bucholtz concluded that the blows to Denise's head had been inflicted after the plastic bags had been put over her head.

Dr. Bucholtz reconstructed the skull, enlisting the help of two doctors who had experience in human bone reconstruction. They concluded that Denise's head had suffered at least 31 separate blows. There was no way to determine how many blows occurred beyond the minimum of 31 because there could have been fractures on top of fractures. Other than the head injuries, Dr. Bucholtz found no signs of external trauma and no signs of defensive wounds. Despite the tightness of the handcuffs, the wrists were not bruised. There was no physical trauma to her vagina or rectum, although Dr. Bucholtz stated that a sexual assault can occur without trauma to those regions.

Dr. Bucholtz determined that Denise's death resulted from blunt force trauma to the head. Because the scalp has many blood vessels, Denise's injuries probably led to profuse bleeding if her heart was still beating at the time of the assault.

  *d. The searches of defendant's Arizona house and California warehouse*

On July 14, 1994, the day after the discovery of the freezer in the rental truck, police officers executed a search warrant at defendant's home in Dewey,

Arizona. The home was heavily cluttered with stacks of newspapers, books, decades-old receipts, and boxes neatly organized in stacks; the police collected over 100,000 items from the residence. Two adjacent boxes on a shelf in defendant's garage had the word "Christmas" written in marker ink on the outside and were identified by investigators as boxes 212 and 213.

Box 212 contained a large black garbage bag similar to the ones used to hold the body in the freezer. In the bag were smaller boxes that contained items belonging to Denise, including her wallet, checkbooks, purse, makeup compact, car keys, pen, lipstick, and other items bearing her name, such as her credit cards and driver's license. Box 212 also contained items that Denise was last seen wearing on the night of her disappearance: her jacket, dress, underwear, and high heels. The left shoulder strap of the dress was torn and frayed, but it was still attached to the dress by a thread. The shoes had severe scrapes on the back of both heels, and the tip of one heel had broken off.[2] The small box that contained the shoes, the keys, wallet, and checkbook displayed bloodstains that had grown moldy and had a strong, foul odor. Box 212 also contained a bloodstained hammer, a bloodstained pair of men's jeans, a bloodstained sweatshirt, dried, blood-soaked rags, and a pair of surgical gloves turned inside out.

Box 213 had bloodstained flaps and contained the empty box for the handcuffs, a roll of duct tape, a bloodstained nail puller, more bloody rags, and a white plastic garbage bag similar to the bags that covered Denise's head. Inside the bag was a grey tarp that was covered in dried blood. The roll of duct tape was

---

[2] Denise's mother, Ione Huber, recognized the shoes and said that she had never seen them damaged before and that Denise would "absolutely not" have gone out in public wearing them in the condition they were found in at defendant's home. Similarly, Robert Calvert, who had gone out with Denise on the night of her disappearance, testified that he noticed no damage to Denise's shoes that night.

the same kind of tape that had been used to cover Denise's face, and the end of the tape matched the tearing on a piece of tape found with the body.

In another corner of the garage was a box that contained another bloodstained tarp. Rolled inside the tarp was a bloodstained shirt. Keys to the handcuffs found on Denise's body were found in one of defendant's desk drawers. The key to the freezer was discovered inside the rental truck. Police found a receipt for the freezer showing it had been ordered on June 10, 1991, a week after Denise's disappearance, and delivered the next day.

In defendant's house, police discovered several issues of the Orange County Register that featured headlines concerning Denise's disappearance. In addition, one of defendant's videotapes began with a recording of a segment from a television show called *Inside Edition* that featured a story about Denise's disappearance.

Boxes 212 and 213 had shipping labels addressed to Dragon Fly at a warehouse on Verdugo Drive in Laguna Hills, California. At the time of Denise's disappearance, defendant owned and operated a painting business out of that warehouse, which he used as his living quarters. Steve Parmentier owned an apparel manufacturing business named "Dragon Fly" in units adjacent to defendant's unit at the warehouse. Parmentier recognized the shipping labels on boxes 212 and 213 and the labeling on many of the bloody rags found in those boxes. Parmentier's business generated waste material during the apparel manufacturing process, and he remembered giving defendant these leftover pieces from time to time while they were neighbors.

On July 18, 1994, Laurie Crutchfield, a forensic scientist with the Orange County crime lab, examined a corner of defendant's former warehouse unit where it was suspected that blood evidence had been cleaned away. Presumptive tests for traces of human blood were positive. After removing some of the drywall and

wood framing from the warehouse unit, Crutchfield discovered an area of "thick deep maroon color" where the concrete flooring met the wood floorboard. She removed the board so the lab could conduct further testing on it.

### e. Other forensic evidence

Mary Hong, a forensic scientist for the Orange County crime lab, conducted polymerase chain reaction (PCR) DNA testing using two genetic markers, the D1S80 and DQ-alpha genes. The tests revealed that the bloodstains from the wood floorboard taken from defendant's former warehouse unit in Orange County, California, the nail puller found in defendant's Arizona home, and many of the other bloodied items recovered from the home could not have come from defendant, but could have come from Denise. No DNA, however, was detected in the bloodstain found on the hammer taken from defendant's home. Most of the blood found on the pair of men's jeans taken from defendant's home was also consistent with Denise's blood, but a few of the stains contained weak indications of genetic markers consistent with defendant's — likely a result of defendant's skin cells detected on the jeans.

Lisa Arnell, a forensic scientist for the Orange County crime lab, processed the 10 rectal samples that Dr. Bucholtz had taken from Denise's body. To isolate and detect any sperm that might be present in those swabs, Arnell used a chemical and mechanical process to separate any of Denise's cells (nonsperm cell fraction) from any sperm cells (sperm cell fraction). She swabbed the sperm cell fraction from the samples and then wiped the swabs on three microscope slides. To each slide, she added a coloring agent designed to stain sperm cells as a red oval dot. The agent stains sperm cells "differentially," meaning that a sperm cell appears dark red on its tail side, but fades to a light red on its other side. She then examined each slide under a microscope.

When forensic scientist Arnell initially looked at the first two slides, she saw one differentially stained red dot, without a tail, on each slide. She indicated in her notes that she did not think the test was conclusive for any sperm, and she wrote "apparent sperm." In her report, however, she concluded she had detected one sperm cell on each of the first two slides. The third slide was derived from a "rectal aspirate": fluid injected into the anal canal and then removed for collection and testing. On the third slide, she identified four red dots as "apparent sperm," none of which had tails. She explained that the dots on the third slide had "a majority of the characteristics" of sperm, but not to the point where she "felt comfortable" to identify them as sperm.

Arnell acknowledged that the FBI's forensic laboratory's protocol does not consider a stained cell lacking a tail to be a sperm cell, but the Orange County crime lab's protocol permits such a conclusion because sperm tails are fragile and often fall off. Arnell believed this was especially true in this case, given the circumstances in which Denise's body had been stored. She acknowledged that pollen and yeast cells may also take the red stain, but she said that these cells do not stain differentially.

Arnell processed all 10 rectal samples, and she gave the cell fractions to forensic scientist Hong for PCR DNA testing. Hong tested four samples — the sperm cell fraction and nonsperm cell fraction of a rectal swab, and the sperm cell fraction and nonsperm cell fraction of the "rectal aspirate" (see *ante*) used to make the third slide reviewed by Arnell. Hong tested the rectal swab samples: The sperm cell fraction generated no result, but the nonsperm cell fraction was consistent with Denise's. Hong tested the rectal aspirate samples: The nonsperm cell fraction generated no result, but the sperm cell fraction was consistent with Denise's and not with defendant's. Hong conceded it was possible a male other than defendant might have been the source of the sperm cell fraction, but she

9

thought it was more likely some of Denise's cells were not successfully removed from the sperm cell fraction, thereby showing up in the DNA test results. Denise's male friends, Calvert and Horrocks, testified that they never had sexual intercourse with her. None of the other vaginal or oral swabs generated any DNA results. In addition, the rectal samples were tested for P30, a protein found in seminal fluid, with negative results.

As to why the DNA test did not confirm the presence of sperm, forensic scientist Arnell stated that it could have been because of degradation or the presence of a low number of sperm cells; the rectum is a particularly hostile environment for sperm because of the bacteria found there. Arnell also noted that the P30 protein degrades relatively faster than the sperm cells, so she would not have expected a positive result. She acknowledged, however, that the freezing process does preserve sperm as well as P30.

Edwin Jones, a criminalist with the Ventura County Sheriff's Department laboratory, examined the same slides that Arnell had examined from the rectal swabs. He agreed with Arnell that two of the slides each showed one sperm, but he disagreed with Arnell's findings on the third slide. He identified five cells as sperm, and not just "apparent sperm." Having conducted thousands of microscopic examinations for sperm during his career, he was certain his opinion was correct.

2. *Defense case*

In an attempt to show that Denise was not forcibly abducted, the defense called Costa Mesa Police Officers Thomas Coute and Burton Santee, who examined the area around Denise's car about one day after her disappearance. They testified that they saw no blood, drag marks, or other signs of a struggle in or around Denise's car. In addition, no trace of blood was found in the white pickup

10

truck used by defendant at the time of Denise's disappearance in California and later found parked at his home in Arizona.

Cynthia Brown, a newspaper carrier, saw a blue Honda car with flashing emergency lights parked on the shoulder of the freeway while she was on her way to pick up newspapers at 2:25 a.m. on June 3, 1991. She saw no one near the car, nor did she see anyone walking on the roadway, or at any of the nearby emergency call boxes.

Defense investigator Beth Goss examined the 64-foot embankment adjacent to where Denise's car had been found and described the slope as steep but manageable on foot. Goss asked a woman fairly close to Denise in height and weight, wearing shoes similar to Denise's shoes, to walk down and back up the embankment. Although the shoes showed damage to the back of the heels, they appeared less damaged than Denise's shoes.

Naurbom Perry, who had hired defendant to paint his house on June 1, 1991, said he saw defendant within hours of Denise's disappearance on June 3, 1991, and noticed no change in his demeanor. But he was unable to reach defendant for the next several days. When he next saw defendant on June 7 or 8, he looked ill and weak. Defendant claimed he had been in bed with pneumonia. The defense introduced records of a Mission Viejo doctor stating that defendant sought medical attention for his illness on June 5, 1991. He had a temperature of 102 degrees and reported that he was under stress, had a sore throat, and felt dizzy, feverish, and weak.

The parties stipulated that Denise's blood-alcohol level would have been between .08 percent and .11 percent at 2:15 a.m. on the night she disappeared, and that a person is considered impaired at .08 percent.

Two defense experts — Charles Sims, a pathologist at Century City Hospital, and William Collier, a criminalist, consulting forensic scientist, and the

11

former director of a crime laboratory in Phoenix, Arizona — both testified they could not conclusively determine the presence of sperm in any of the slides examined by prosecution experts Arnell and Jones. They based their conclusion in part on the lack of visible tails. According to Sims, the freezing and thawing process could have created irregular cells, and Collier believed the cells' shapes were not consistent with sperm. Sims, however, had never before testified as an expert witness in a criminal case and conceded that forensic pathologists are best qualified to determine the presence of sperm. Collier admitted that he had not been proficiency tested on sperm identification in over 20 years.

## B. Penalty Phase

### 1. Prosecution's case

#### a. Defendant's prior violent offenses

The prosecution presented evidence from two of defendant's ex-girlfriends concerning incidents in which defendant forcibly handcuffed them.

In 1987, defendant was dating Cheryl W. They took a trip to New York City, where they stayed in a hotel room facing Times Square. One morning, as they were play-fighting in bed, defendant handcuffed Cheryl by both wrists to a bar across the window. Defendant then pulled off her nightgown, opened the curtains on the window, walked out of the hotel room laughing, and left her there naked for several hours. When defendant returned and released her handcuffs, he was still laughing. Cheryl was traumatized and could not speak; when she rejected defendant's attempts to become amorous, he appeared to realize that she was upset and tried to calm her down. Cheryl decided to "play along" with defendant for the remainder of the trip so she could get back to California safely. Cheryl ended the relationship after they returned to California, but in 1991 she resumed their relationship, and they remained friends even after defendant moved to Arizona.

Cheryl denied she had been handcuffed consensually as part of consensual sex with defendant, despite photographs taken of her wearing handcuffs in the hotel room that morning. One photograph showed her smiling and handcuffed naked to the hotel window with the curtains open, and a second photograph showed her smiling and naked while her handcuffed hands fondled defendant's penis. She acknowledged that the photographs must have been taken that morning, but she did not remember them being taken, claiming to have "blockages" in her memory "because of the trauma." As a result of the incident, Cheryl has been unable to have a relationship with a man because she has found it difficult to "trust or open up."

Nancy R. had been dating defendant for about a year when, in March or April of 1989, she stopped by his home in Lake Forest, California. After they kissed for a time in his bedroom, Nancy said she was in a hurry and had to leave. Defendant, however, pushed her onto the bed, causing her back, shoulder, and head to hit a bookcase. When Nancy again said she had to go, he placed the full weight of his body on top of her. Nancy then tried to struggle with him. During the 10-to-15-minute struggle, defendant pried her legs apart and unzipped her shorts. He then sat on her chest, pinned her arms down with his knees, raised her arms above her head, and handcuffed her. Nancy assumed the handcuffs came from defendant's bedpost because he normally kept a pair hanging there. Defendant had never used handcuffs in her previous sexual encounters with him, and she became frightened and angry. Defendant undid his pants, pulled Nancy's shorts down, and gave her an intense stare and a look she had never seen before. When she began to cry and threatened to make a report of date rape to the police, defendant jumped off her, refastened his pants, and uncuffed her. As he left the room, defendant called her a "bitch" and yelled, "you are the one that brought this on."

13

The incident left Nancy's wrists scraped and raw.  She did not see defendant for three or four months, but they eventually reconciled.  Defendant later told Nancy that the handcuffing was just a mature sex game that she did not understand, and he had not expected her to react as she did.  He never again tried to use handcuffs on her.  Nancy and defendant became engaged in early 1991, but she ended the engagement in June 1991.

### b. Victim impact testimony

Denise's parents, Ione and Dennis Huber, testified their lives were "turned upside down" by their daughter's sudden disappearance.  They both remarked that words alone could not adequately describe the three years of "not knowing" or their grief after learning she was dead.

Ione was frantic when Denise failed to come home that night; after discovering Denise's car, she felt as if she had been kicked in the stomach.  She could not eat or sleep for several days.  To try to find Denise, the Hubers sent fliers to businesses and newspapers across the country, and they did numerous television interviews.  Four months after Denise's disappearance, Ione returned to work, but only on a part-time basis.  The holiday seasons were painful because Denise was not there.

Ione missed doing many of the things she and Denise had done together, such as going out to lunch, going to the beach or the pool, and cooking.  Denise was a sensitive, caring, and compassionate person who had brought great joy to Ione.  After Denise's disappearance, Ione underwent several surgeries, including cancer surgery; she believed the stress from the loss contributed to her ill health.

During the years Denise was missing, her father Dennis had a sick feeling that never got better.  He felt even sicker whenever there was news that a body or human bones had been found.  On one occasion, the Hubers took a trip to Palm

14

Springs to try to relax, but as soon as they arrived they heard news of a body discovered in the desert. They decided to drive home because they thought that it would be better to be there if the remains were those of Denise. The next day, they learned that the body was not Denise's. Dennis was scheduled to open his own business on the day of Denise's disappearance, but he never did because he could not think about business while she was missing.

Dennis missed the Friday morning breakfasts he had every week with Denise. Denise was a happy person and had the ability to cheer him up, even on bad days. A day or two before she disappeared, Denise left a note on his computer screen at home, signed with a happy face, that said: "Hi, Dad. I love you. Have a great day. Love, Denise." Dennis would not trade that piece of paper for a million dollars. Dennis was suffering from many health problems that he attributed to the stress surrounding Denise's disappearance and her death.

2. *Defense case*

The defense called more than 20 witnesses, including defendant's mother, brother, sister, and niece; neighbors and classmates from his childhood; a woman whom he rescued from a knife-wielding attacker; people who worked with him; some of his friends; and his priest. These witnesses provided a detailed description of defendant's childhood and adult life.

Defendant was born to Ann and Angelo Famalaro in Long Island, New York on June 10, 1957. He was the youngest of three children. When defendant was about a year old, the family moved to Santa Ana, California.

Angelo, an Air Force veteran, was a businessman. Ann, a stay-at-home mother, was temperamental and "the dominant force" in the family. Angelo tolerated her demands and her verbal abuse. The children had a loving relationship with their father, but a more erratic relationship with their mother.

15

Ann frequently invoked religion to justify her behavior and to intimidate others. For instance, when she thought the children had done something wrong, she often told them they were going to hell and she needed to "save" their souls. The children generally coped by following their father's lead — giving in to their mother's demands to avoid confrontation. Ann controlled what the children wore, selected their classes, rummaged through their belongings, and eavesdropped on their telephone calls.

Ann alienated the family from others in the neighborhood because she was a busybody and a curmudgeon who often became unreasonably upset over minor matters. The neighborhood children never played at the Famalaro home, and the Famalaro children rarely interacted with them. The family regularly attended church but had little or no interaction with fellow church members, who described them as very "focused" and well behaved, with the children staring straight ahead at all times.

Ann kept the family's yard tidy and neat, but the inside of the house was messy because she hoarded stacks of newspapers, magazines, food, laundry, silver, and boxes. Some of her hoarding resulted from her fierce anti-communism: She believed the family needed to hoard food and silver to survive a possible Russian invasion.

As a child, defendant was weak and often sick. He was picked on at school, where he was nicknamed "Femalaro" because he was effeminate and meek. Defendant had a small frame and was very thin and "kind of bent over." He had few friends and was described as a "loner." Defendant was never violent as a child.

Defendant's mood swung from hyperactivity to depression. When he was hyperactive, he moved constantly and needed an organized activity to focus his attention. His head and neck twitched when he was nervous, and he engaged in

16

obsessive "ritual" behavior involving symmetry, so that if someone touched him on one side he needed the other side touched "so it would be even." He collected piles of books, papers, and magazines in his room. His quirks and his inability to sit still and focus often got him into trouble at home and at school.

Defendant received little attention from his mother, who instead focused on the achievements of his older brother, Warren, who was gregarious and excelled in school activities. Defendant's sister, Marion, tried to fill the void by being defendant's protector, often helping with his homework and riding the bus with him so he would not be picked on by other kids. Defendant was also close to his maternal grandmother, who lived on and off with the family.

As the boys grew up, Ann disciplined them with a belt, and she continued to bathe them personally into their preteen years. According to defendant's brother, Warren, Ann paid special attention to scrubbing his genitals, telling him it was a special area that needed to be cleaned correctly. When she cleaned that area, her demeanor changed: Her breathing escalated as if she got "an energy surge." She was preoccupied with ensuring that the children did not engage in and were not exposed to any sexual activity: She did not allow them to take any sex education classes and did not permit them to see anything on television or movies that was more intimate than hand-holding. She often entered the boys' rooms at night to make sure they were not masturbating. During their teen years, Ann did not allow the children to date.

On one occasion, when Warren was attending college, Ann secretly followed Warren and his girlfriend, Mary, to a motel room, and waited until Warren left. Using a ruse, she barged into the room and confronted Mary. She swore at Mary, slapped her in the face, rambled on about religion and sex, and claimed Mary would die that same night. When Mary asked how that was going

17

to happen, Ann tackled her and began choking her. Mary broke free and called the police, but Warren later persuaded her not to press charges.

When defendant was a teenager, Ann sent him to a seminary, not with the hope that he would become a priest, but so "a lot of that would rub off on him." After he graduated, he went to a Catholic liberal arts college, where he met Ruth W., with whom he had an on-and-off relationship for two to three years. During that time, Ruth had an abortion. Near the end of the relationship, she became pregnant again. She refused defendant's marriage proposal, gave up the child for adoption, and moved to Texas. Ruth's abortion and her decisions to end the relationship and to give up the child in her second pregnancy were painful and traumatic for defendant. Her decision to give up the child for adoption was particularly upsetting, as defendant had hoped to raise the child himself, but he lost a court battle for custody and was later unable to learn where the baby was. In Warren's view, defendant's relationship with Ruth failed not because of defendant, but because Ruth's family was frightened of Ann's behavior.

Around this time, Ann became involved in local politics and campaigned against abortion, pornography, and a local adult theater. She ran for a seat on the Santa Ana City Council, but on the same day she announced her candidacy, Warren was arrested for sexually molesting a 10-year-old girl and a 10-year-old boy and for having unlawful intercourse with a 17-year-old girl. This ended Ann's political campaign. Warren was convicted and was committed to Patton State Hospital as a mentally disordered sex offender. To get away from the embarrassment, defendant's parents moved to Prescott, Arizona.

Over the next several years, defendant attended various colleges, at one point studying to become a chiropractor, but he never completed his courses. During this period, he lived with his maternal grandmother, who also hoarded stacks of papers and boxes.

18

While studying to be a chiropractor, defendant saved a woman who was being assaulted at knifepoint. At a bus stop, defendant saw an assailant grab the woman and hold a knife to her side. Defendant, who had studied martial arts, tackled the assailant, took away the knife, and pinned him to the ground until the police arrived.

After defendant's grandmother moved away to live with Ann in Arizona, defendant was self-employed in a number of different businesses, including house-cleaning, maintenance, and painting. He eventually got into the house-painting business, hired a team of painters, and moved his business into the warehouse on Verdugo Drive in Laguna Hills, California.

As defendant grew older, he became more social and had several girlfriends over the years. On many occasions, however, his work would overwhelm him, often at the cost of his social life, his appearance, and his health. Defendant's friends and ex-girlfriends said he had a good sense of humor, and they described him as fun, intelligent, nice, respectful, considerate, and polite. But they also described him as secretive, manipulative, and a smooth talker.

As an adult, defendant's mood swings continued; at times he was manic and had high energy, but he could also be withdrawn and depressed. He remained deeply religious, but he developed a more open attitude about sex. He continued to amass papers, books, and boxes, and he was paranoid about his possessions; he kept his rooms locked and was nervous whenever people were around his things.

On May 27, 1991 (a week before Denise's murder), defendant made a 42-minute telephone call to the Hotline Help Center in Orange County, which helped callers with issues of depression and thoughts of suicide and was also used as a prayer line. In June 1991, defendant's sister, Marion, received a telephone call from defendant, who cried and said he was upset about something that had happened many years earlier.

19

In the summer of 1992, defendant moved to Arizona because his father had been hospitalized there.  Marion and her family had moved there as well.  Marion's daughters were very close to defendant, and he was generous to them and to his parents.  Defendant was arrested in Arizona for the charged offenses as he was returning home with his mother after visiting his father in the hospital.

## II.  PRETRIAL ISSUES

### A.  Motions for Change of Venue

Before jury selection, defendant moved unsuccessfully for a change of venue; he renewed this motion after the jury had been selected, and he again raised the issue after trial.  He now contends the trial court's denials of these motions violated his rights to a fair trial, an impartial jury, and a reliable penalty determination under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

#### 1.  Defendant's pretrial motion for change of venue

##### a.  Facts

In November 1996, defendant filed a pretrial motion for change of venue. He argued that the ongoing local media coverage and the community's expression of sympathy for Denise and her family made the case "an Orange County experience" by placing "a very personal face" on the Huber family's story. Defendant claimed that local news reports had portrayed him in sensational and negative terms and had speculated that he was a serial killer, that he had engaged in necrophilia, and that he had stalked previous girlfriends.  He also cited news stories describing otherwise inadmissible evidence of his guilt, including a videotaped police interrogation where he was seen invoking his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436), descriptions of searches on his property for other possible victims, and stories of him handcuffing and assaulting

20

other women.  Included with the motion were copies and clippings of over 250 newspaper articles and numerous videotapes of television news stories related to the case.

Defendant also attached to the motion a report of a random telephone survey of 401 Orange County residents conducted in September 1996 by defense expert Edward J. Bronson, Ph.D., professor of public law at California State University, Chico.  According to the report, 83 percent of the participants knew of the case.  Of those who recognized the case, 70 percent said that defendant was definitely or probably guilty of murder, and 72 percent said he should receive the death penalty.  A second defense survey conducted in February 1997 showed nearly identical percentages.

The trial court held a hearing on the motion in February 1997.  The parties stipulated that Orange County was the third most populous county in California and the fifth most populous county in the nation, with a population of 2,563,971 in 1995.

At the hearing, defense expert Bronson testified that Orange County had responded to Denise's disappearance and murder much as a small community would have.  The media coverage, he explained, portrayed Denise and her parents in a very positive light, while doing the opposite for defendant.  He noted that his telephone surveys showed a clear positive relationship between a participant's propensity to follow the news and the participant's prejudgment of guilt.  The surveys showed prejudgment rates in the 70 percent range, the second highest Bronson had seen in the 15 or so surveys he had conducted in capital cases.  In his experience, even in the worst cases the rate of prejudgment of a death sentence is typically near 50 percent.  Based on the surveys, the volume of stories in the local news media, and the inflammatory language in those stories, he concluded that defendant could not receive a fair trial in Orange County.

21

Prosecution expert Ebbe Ebbesen, a psychology professor at the University of California, San Diego, faulted defense expert Bronson's September 1996 telephone survey for not distinguishing among participants based on the extent of their knowledge about the case, and for not asking test questions to determine whether participants were answering truthfully. In Dr. Ebbesen's view, Bronson's survey question concerning prejudgment of guilt biased the participants towards believing defendant was guilty because it mentioned that defendant had been charged with murder but failed to mention the prosecution's burden of proving guilt beyond a reasonable doubt, and Ebbesen criticized the survey for failing to measure the strength of the participants' opinions as to defendant's guilt and the appropriate penalty.

Using the raw data from defense expert Bronson's telephonic survey, Dr. Ebbesen isolated those participants who knew nothing about the case and those who were familiar with the case but had not prejudged defendant's guilt. Using these criteria, he concluded that 47.6 percent of the survey's participants fell into one of these two categories. In Dr. Ebbesen's view, the publicity would not lead prospective jurors to form fixed opinions, as such opinions are fixed by preexisting attitudes about proof and the judicial system. In the nearly 40 cases in which the prosecution had consulted him, he had not seen the defense present sufficient evidence to prove that a change of venue was necessary to provide the defendant with a fair trial.

In rebuttal, Ronald Dillahey, a psychology professor at the University of Nevada, Reno, testified for the defense that the telephonic survey by defense expert Bronson revealed a high awareness level that jeopardized the fairness of a trial in Orange County. According to him, the participants' prejudgment of defendant's guilt and death sentence was much higher in this survey than in other similar studies, which typically show that between 15 and 22 percent of people

believe a defendant is probably guilty just because he is charged and that in California 63 percent support the death penalty over a sentence of life imprisonment without the possibility of parole. Those who are generally predisposed to assume guilt are attracted to news about crime, and such exposure strengthens their prejudgment of guilt. But, Dillahey stated, there is no reliable way to measure how fixed an opinion may be, and it is very difficult for jurors to set aside knowledge of the case in reaching their opinions.

In denying defendant's motion, the trial court found the testimony of all three experts helpful but biased in favor of their respective parties. The court criticized the defense survey for not measuring the strength of the participants' opinions. It acknowledged the high level of publicity, but it found that the publicity was "relatively unspectacular." And it cited Orange County's large population as the strongest factor supporting its conclusion that defendant could receive a fair trial there.

Defendant unsuccessfully sought a writ of mandate in the Court of Appeal, challenging the trial court's denial of his motion for a change of venue. Defendant also filed a petition for review in this court, which we denied.

   *b. Analysis*

Defendant argues that the trial court should have granted his pretrial motion for change of venue. We disagree.

A motion for change of venue must be granted when "there is a reasonable likelihood that a fair and impartial trial cannot be had in the county" in which the defendant is charged. (§ 1033, subd. (a).) The trial court's initial venue determination as well as our independent evaluation must consider five factors: " '(1) nature and gravity of the offense; (2) nature and extent of the media coverage; (3) size of the community; (4) community status of the defendant; and

23

(5) prominence of the victim.' [Citations.]" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1394.) On appeal, a successful challenge to a trial court's denial of the motion must show both error and prejudice, that is, that "at the time of the motion it was reasonably likely that a fair trial could not be had in the county, and that it was reasonably likely that a fair trial was not had. [Citations.]" (*People v. Davis* (2009) 46 Cal.4th 539, 578.) Although we will sustain the trial court's determination of the relevant facts if supported by substantial evidence, " '[w]e independently review the court's ultimate determination of the reasonable likelihood of an unfair trial.' " (*People v. Hart* (1999) 20 Cal.4th 546, 598.)

As to the first factor — the nature and gravity of the offense — here the charged crimes of kidnapping, sexual assault, and murder were serious offenses. But the presence of this factor, standing alone, does not require a change of venue. (See, e.g., *People v. Zambrano* (2007) 41 Cal.4th 1082, 1125, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

With regard to the second factor — the nature and extent of the media coverage — the coverage of the case was heavy, particularly after discovery of Denise's naked body, which had been in defendant's freezer for three years. Defendant submitted 289 newspaper articles and editorials covering the case from the time of Denise's disappearance until the end of jury selection. Almost all of the major television stations in Southern California covered the case; defendant submitted television segments that were, in combination, more than four hours long.

But the number of newspaper stories and the length of the television coverage are somewhat misleading because of the large number of newspapers and television stations in media-saturated Southern California. Most of the news stories appeared in two large, widely read newspapers (the Los Angeles Times and the Orange County Register), but some appeared in papers that were likely to be

24

read only in smaller segments of Orange County (the Daily Pilot, the San Clemente Sun Post, and the Excelsior Weekly). And the large number of television stations in the Los Angeles basin (defendant submitted segments from eight different stations) resulted in far more total minutes of coverage than would have been likely in a small community served by only one or two stations.

According to defendant, a few news reports pertained to matters that were inadmissible at trial and contained potentially prejudicial information. For example, some early reports suggested that the police believed defendant might be a serial killer, that he was fascinated by mass murderers, and that he was perhaps a necrophiliac. Some television stations reported that defendant had left a grenade at his former Orange County home, which had to be recovered by a bomb squad; that a neighbor had reported seeing several young boys going in and out of that home late at night while defendant lived there; and that defendant kept a videotape library that featured stories of infamous mass murderers. But these stories appeared in the summer of 1994, when defendant was arrested, and the trial did not take place until the spring of 1997, almost three years later. It is reasonable to infer that the memories of any prospective jurors who read these newspaper stories or listened to these television reports would have been dimmed by the passage of time. (See *Patton v. Yount* (1984) 467 U.S. 1025, 1034 ["That time soothes and erases is a perfectly natural phenomenon, familiar to all"].) The newspaper and television reports at the time of trial were generally factual, containing no inadmissible or prejudicial material, except that some mentioned that Denise's parents wanted defendant to receive the death sentence. (See *Payne v. Tennessee* (1991) 501 U.S. 808, 830, fn. 2 ["the admission of a victim's family members' . . . opinions about . . . the appropriate sentence violates the Eighth Amendment"].)

Although the heavy media coverage (factor two) weighed *in favor of* a change of venue, this factor did not necessarily *require* a change of venue. For

25

example, in *People v. Ramirez* (2006) 39 Cal.4th 398, we upheld the trial court's denial of a motion for change of venue by an accused serial killer, even though the trial court itself had "described the media coverage of the murders and defendant's arrest as 'saturation.' " (*Id.* at p. 434.)

With respect to the third factor — the size of the community — we agree with the trial court that this weighed strongly *against* a change of venue. At the time of trial, Orange County was a major metropolitan area, with a population of over two and a half million people, making it one of the most populous counties not only in California but also in the United States (fifth largest). When, as here, there is a "large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empanelled is hard to sustain." (*Skilling v. United States* (2010) ___ U.S. ___, ___ [130 S.Ct. 2896, 2915].) This circumstance weighed " 'heavily against a change of venue.' " (*People v. Leonard*, *supra*, 40 Cal.4th at p. 1396; see also *People v. Ramirez*, *supra*, 39 Cal.4th at p. 434; *People v. Pride* (1992) 3 Cal.4th 195, 224.)

The fourth factor — community status of the defendant — did not weigh heavily for or against a change of venue. There is no evidence that defendant or his family was well known before defendant's arrest for the murder; he grew up in Orange County, had no criminal record, and was not associated with any group (such as a disfavored racial minority or juvenile street gang) towards which the community was "likely to be hostile." (*Odle v. Superior Court* (1982) 32 Cal.3d 932, 940; compare with *People v. Williams* (1989) 48 Cal.3d 1112, 1131-1132.) Thus, this was a "neutral factor[]." (*Odle*, at p. 942.)

Arguing that the fifth factor — the victim's community status — weighed in favor of a change of venue, defendant contends that Denise became well known in Orange County after her disappearance. Defendant notes that dozens of pictures of her appeared in the major Southern California newspapers, and that

26

local television stations repeatedly broadcast her picture and video clips of her celebrating her last birthday. Similarly, Denise's parents became known locally as the media chronicled their search for their daughter and their grief on learning of her death.

But there was no evidence that Denise "came from an extended family with long and extensive ties to the community." (*People v. Williams*, *supra*, 48 Cal.3d 1112, 1129.) And there was no evidence that the potential jury pool in Orange County was comprised of persons who personally knew Denise. Denise and her family came to the public's attention first through the publicity surrounding Denise's sudden and unexplained disappearance after being stranded on a freeway late at night with a flat tire, and then from the discovery, three years later, of her naked body stored in a freezer inside a rental truck parked at defendant's Arizona home. These aspects would have followed the case to any county to which venue was changed. (See *Odle v. Superior Court*, *supra*, 32 Cal.3d 932, 942 [murdered police officer became "posthumous celebrity" because of his "status as an officer, killed in the line of duty," but "that aspect of the case would follow . . . to whatever community in which venue ultimately resides"].)

Even if, as defendant contends, the publicity caused some residents to feel a connection to Denise's family, nothing indicated that such sentiments were widespread in a densely populated county with numerous cities and communities. Accordingly, this factor — the victim's community status — did not weigh in favor of a venue change.

"When pretrial publicity is at issue, 'primary reliance on the judgment of the trial court makes [especially] good sense' because the judge 'sits in the locale where the publicity is said to have had its effect' and may base [the] evaluation on [the judge's] 'own perception of the depth and extent of news stories that might influence a juror.' " (*Skilling v. United States*, *supra*, ___ U.S. at p. ___ [130 S.Ct.

27

at p. 2918].)  Here, we agree with the trial court's conclusion that defendant did not show a reasonable likelihood that he could not receive a fair and impartial trial in Orange County.  The trial court's denial of defendant's pretrial motion for a change of venue was therefore proper.

   2.  *Defendant's post-jury-selection change of venue motion*

      a.  *Facts*

   The trial court ordered 1,200 prospective jurors to appear on April 7, 1997. The prospective jurors were brought before the court in eight groups of 150.  The court introduced the parties, described the case and the estimated length of trial, and directed the prospective jurors to fill out either a hardship form excusing jury service (if appropriate) or a one-page questionnaire regarding their exposure to pretrial publicity in this case.  By the end of the day, after many prospective jurors were dismissed for hardship, 475 remained.

   The questionnaires on pretrial publicity revealed that 81 percent of the prospective jurors had prior knowledge of the case, approximately half of whom had formed the opinion that defendant was guilty and/or should receive the death penalty if convicted.  Of these, 46 percent, or 110 of the prospective jurors, said they were unable to set that opinion aside.

   The answers to the questionnaires and some additional showings of hardship led to the dismissal of a number of prospective jurors.  The 343 who remained were told to complete a five-page questionnaire concerning their attitudes about the death penalty.  The court questioned and dismissed several who claimed hardship from serving as a juror, a few of whom also expressed an inability to give defendant a fair trial.  At the end of the day, approximately 250 prospective jurors remained.

The trial court questioned those remaining prospective jurors about their views on the death penalty. After dismissing several jurors because of their views on the death penalty, the trial court conducted an inquiry based on defense counsel's claim of troubling comments made by several prospective jurors during the jury selection; some of those comments were quoted in a newspaper article.

On the first day of jury selection, one dismissed juror allegedly told a group of remaining prospective jurors in the courthouse elevator area to "hang" defendant. That same day, while completing his questionnaire on pretrial publicity, a prospective juror wrote that another prospective juror had told him "defendant is 'guilty as hell.' " Another, in her questionnaire, asked the trial court not to have her go back to work on Fridays because she feared being confronted and overwhelmed by curious coworkers. Prospective Juror No. 138, who wrote in the questionnaire that he knew little about the case and had not prejudged defendant's guilt or penalty, was called into the judge's chambers and admitted yelling in front of a group of prospective jurors that he did not want to look "at that piece of scum [defendant]."

Thereafter, the trial court asked the remaining prospective jurors if they had heard the opinions of other prospective jurors on the case. Nine said they had. (None of these jurors was ultimately impaneled.) According to these prospective jurors, other prospective jurors had said that defendant "is just obviously guilty," and "should definitely be put to death," "should fry," and should "get the ax." Some had heard Prospective Juror No. 138 describe defendant as "scum" and go into a "tirade" about criminal defendants in general. Others reported hearing some prospective jurors disclose their reading of articles about the case and hearing that the victim's head had been cut open and gashed. With the exception of Prospective Juror No. 138, none of the prospective jurors who had made these comments was identified.

29

The trial court also asked the prospective jurors if they had been exposed to media reports about the case since the day they had to report for jury duty. Twenty-six (none of whom was ultimately impaneled) said they had. Two reported reading only headlines and a few lines of some newspaper articles; some reported merely hearing brief snippets about the case on the radio or television. But five had read a long newspaper article about the case appearing in the Orange County Register. Several had heard negative comments from friends, family, or coworkers about the case and defendant. One juror inadvertently heard a discussion about the case in her gym class and at that point learned more about the case.

Defense counsel requested that the trial court ask the prospective jurors whether any had heard opinions about the case from friends, family, and coworkers. The court denied the request but permitted the parties to make this inquiry during individual questioning.

Defendant moved to quash the venire, arguing that the prospective jurors were having "vitriolic" conversations that created an "atmosphere" against him, and that it was impossible to determine how many panelists were exposed to or involved in these discussions because many of the prospective jurors who participated in them had not come forward. The trial court denied the motion, concluding that, out of the large group of prospective jurors only a "handful, if it is even that," of objectionable conversations had occurred.

For the next five and a half days, the trial court questioned some 150 prospective jurors. First, 12 prospective jurors were called into the jury box and questioned in the presence of all the remaining prospective jurors. As individual jurors were dismissed for cause or by peremptory challenge, each was replaced by a prospective juror in the audience. Defense counsel lodged a continuing objection for cause to any juror who had pretrial knowledge of the case, which the

30

court overruled with a standing order. In all, the court examined over 170 prospective jurors on issues other than claims that jury service would be a hardship.

During voir dire, 32 prospective jurors said they would automatically vote for death and would have difficulty setting aside that opinion; 24 of these jurors had previously indicated in the questionnaire on pretrial publicity that they had not prejudged defendant's penalty or, if they had, they could set that opinion aside. Five testified that their knowledge of the case led them to think that death was the only appropriate penalty for defendant. One of them, Prospective Juror No. 174, when asked what defendant's sentence should be, said, "fry him," which prompted laughter in the courtroom.

Sixteen prospective jurors expressed compassion for murder victim Denise Huber's parents or fear relating to Denise's abduction. One of them said she could not be fair because "I see [Denise's] face in front of me all the time now, and it is so scary," and four described seeing a banner for Denise in the years she was missing and feeling empathy for her and her family. One of those four, Prospective Juror No. 353, was impaneled. Seven of these 16 prospective jurors mentioned having daughters around the same age as Denise when she disappeared and expressed feelings about the case as a result. Two of these seven — Prospective Jurors Nos. 219 and 384 — eventually were impaneled as jurors, while a third, Prospective Juror No. 277, was impaneled as an alternate.

Some prospective jurors were asked whether they felt pressure from the community. Many said they did not, but nine said they had received unsolicited opinions from friends, family, or coworkers. Of these nine, four were eventually impaneled as jurors. One, Prospective Juror No. 411, disclosed that when she told a friend and her husband that she was being called as a juror in this case, her husband jokingly told her to "fry him." Another, Prospective Juror No. 353,

31

described his coworkers as having a "just fry him attitude." Still others, Prospective Jurors Nos. 219 and 134, said their coworkers were trying to offer them their views of the case. All of the prospective jurors in question, however, said they would not be affected by other people's opinions.

Near the end of jury selection in May 1997, the defense exhausted its 20 peremptory challenges; the trial court refused a defense request for additional challenges. The prosecution, with five unused peremptory challenges, accepted the 12 prospective jurors, and the court proceeded to select four alternates.

After the defense exhausted all of its peremptory challenges against the alternate jurors, defense counsel expressed dissatisfaction with all of the jurors and again requested additional peremptory challenges, which the trial court denied. As the court was about to release the unselected individuals from jury duty, Juror No. 200, who had been seated as an alternate, interrupted the court, saying she was no longer sure she could be fair. She explained: "I'll be honest, I'm having a hard time even looking at the defendant." To replace her, the trial court resumed jury selection.

After a handful of prospective jurors were questioned, the prosecution accepted the alternates. Defense counsel made a third request for additional peremptory challenges, mentioning that Juror No. 331, just seated as an alternate, had written in her questionnaire that she believed in an "eye for an eye," unless the defendant was insane or had remorse, although on voir dire she testified that she could be fair and would consider the relevant legal factors before imposing a penalty of death. The trial court found Juror No. 331's testimony credible, but before ruling on the defense request for additional peremptory challenges, it held a hearing in chambers to consider notes it had received from two prospective jurors (Prospective Jurors Nos. 285 and 432) regarding two seated jurors (Jurors Nos. 154 and 236).

At that hearing, the two complaining prospective jurors explained that Jurors Nos. 154 (seated in the jury) and 236 (an alternate) had not disclosed that they knew each other and were old friends. The complaining prospective jurors said they had heard those two jurors repeatedly discuss details of the case throughout jury selection. Prospective Juror No. 285 recalled that on the second day of jury selection, she heard Juror No. 154 tell a group of about seven prospective jurors that Denise had been bludgeoned, how her family was expected in court that day, and that the family needed "closure." And Jurors Nos. 154 and 236 were overheard saying that "no one would know if we talked on the phone."

Complaining Prospective Juror No. 285 said she heard Juror No. 236 make "endless" comments during voir dire, pointing out certain things that subjected prospective jurors to dismissal. Prospective Juror No. 285 stated that many prospective jurors viewed the jury selection process as merely a "challenge" to win a seat in the jury box, an attitude that disappointed and upset her. Her comments echoed comments made three days earlier by Prospective Juror No. 256, who told the court in chambers that there appeared to be "a rush for people wanting to be on this jury so badly for some reason" and that people were changing their answers "so they can stay."

The trial court separately questioned Jurors Nos. 154 and 236 about the allegations. Juror No. 236 acknowledged knowing Juror No. 154 for 23 years, but she denied discussing the case with her or anyone else. Juror No. 154 reluctantly acknowledged that she might have discussed the case with Juror No. 236, but she could not recall what they talked about. The court disbelieved both jurors and excused them from further jury service.

Jury selection resumed. The trial court gave each party two extra peremptory challenges and allowed defense counsel to divide them between the seated jurors and the alternates. As jury selection continued, Prospective Juror

33

No. 393, during her questioning, spontaneously disclosed that she had heard two other prospective jurors discuss their disbelief that they were "breathing the same air as" defendant. The prosecutor exercised a peremptory challenge against her.

After both parties exhausted their challenges for the alternate jurors, defense counsel made another request for additional challenges, which the trial court denied. The court then swore in the 12 jurors and 4 alternates. The 12 jurors selected remained throughout the case and none of the alternates was seated.

After the jury had been selected, defendant renewed his motions to quash the venire and to change venue, or, in the alternative, to sequester the jury. In support, defense counsel noted that the trial court had dismissed roughly 215 prospective jurors based on perceived bias against defendant stemming from publicity and their views on the death penalty, that many prospective jurors had expressed their bias in court in front of the other prospective jurors, and that many of the prospective jurors had been exposed to negative opinions about defendant from friends, family, and coworkers. The defense also presented evidence that, after a lull in coverage in 1995 and most of 1996, at least 40 articles had appeared in local newspapers in the period between the trial court's denial of defendant's initial change of venue motion and the end of jury selection, many of which were on the front page. Three local newspapers, five local televisions stations, and three radio stations had filed requests for extended media coverage, indicating that interest in the case remained high.

The trial court denied defendant's motions, agreeing with the prosecution that the selection process had successfully eliminated the prospective jurors who held fixed opinions, and had not caused the remaining jurors to become biased.

34

*b. Analysis*

Defendant contends the jury selection process demonstrated " 'a reasonable likelihood' " (*People v. Davis*, *supra*, 46 Cal.4th at p. 578) that a fair trial could not be held in Orange County, and that the trial court therefore erred in denying his renewed motions to quash the venire and to change venue. In evaluating this claim, our independent review encompasses " 'the voir dire of the actual, available jury pool and the actual jury panel selected.' " (*People v. Vieira* (2005) 35 Cal.4th 264, 279, quoting *People v. Williams*, *supra*, 48 Cal.3d at p. 1125.) We reject defendant's contention.

True, the jury selection process indicated that defendant's case was well known in Orange County, and that there was considerable community sentiment that he was guilty of murdering Denise and should be executed for that crime. Out of an original pool of 1,200 prospective jurors, 475 jurors remained after the first round of hardship eliminations. Of these 475 prospective jurors, 110 had prejudged defendant's guilt and/or penalty of death (if convicted) and were unable to set that opinion aside. But all of these jurors were eliminated early on; only 16 of these 110 prospective jurors were questioned during jury selection.

Some persons with biases remained after the screening of the publicity questionnaires. Prospective jurors who had claimed no bias in their questionnaires called defendant "scum" and said he should "fry," and a number of prospective jurors who had written in their questionnaires that they could be fair testified on voir dire that they could only impose a penalty of death. Other prospective jurors acknowledged discussing the case or viewing media coverage of it. Two prospective jurors who were nearly seated failed to disclose that they were longtime friends who wanted to surreptitiously discuss the case over the telephone. Some prospective jurors believed that other panelists were trying to give answers that would result in their selection as jurors. (See *People v. Williams*, *supra*, 48

35

Cal.3d 1112, 1131, quoting *People v. Tidwell* (1970) 3 Cal.3d 62, 74-75 [" 'the juror may consider himself honored and fortunate to be selected to culminate a community's anger against' " a defendant " 'accused of killing [a] respected member[] of that community' "].)

Nevertheless, none of the problematic *prospective* jurors survived the selection process. The trial court properly excused all of the biased prospective jurors for cause; on appeal, defendant does not identify a single prospective juror as to whom the court erroneously denied a defense challenge for cause. The huge number of prospective jurors initially summoned (1,200) ensured that an ample number of unbiased prospective jurors remained after the biased ones had been excused.

The comments by prospective jurors about wanting to "fry" defendant were inappropriate. Also improper was the conduct of Jurors Nos. 154 and 236, who concealed their friendship and ignored the trial court's admonition not to discuss the case. But the trial court responded appropriately: It gave the parties additional peremptory challenges, and it carefully questioned prospective jurors about whether they had heard other prospective jurors commenting about the case and, if so, whether any of those comments would affect their ability to be fair. These measures were sufficient to ensure a fair selection process.

Turning to the 12 empanelled jurors, 10 of them had prior knowledge of the case. Defendant points out that one of them, Juror No. 219, mentioned in the questionnaire on pretrial publicity that he believed defendant was guilty, but he added that he could put that opinion aside. Another one, Juror No. 289, did not prejudge defendant's guilt, but added that, "there did seem to be a great deal of evidence against him." A third, Juror No. 411, expressed sympathy for the Huber family; she described seeing the banner on the freeway seeking information about

Denise's whereabouts and recalled repeatedly thinking "about how scary it was to not have a cell phone if something were to happen."

Defendant further notes that several seated jurors had been exposed to comments about the case by members of the community. Jurors Nos. 411 and 353 described friends, family members, or coworkers offering them the unsolicited opinion that defendant should "fry." (See p. 32, *ante*.) Two others, Jurors Nos. 219 and 134, described coworkers trying to offer their opinions of the case. (*Ibid*.) And Juror No. 384, the eventual foreperson, had extensive pretrial knowledge of the case.[3]

But the circumstance that most of the actual jurors have prior knowledge of a case does not necessarily require a change of venue. (See, e.g., *People v. Davis*, *supra*, 46 Cal.4th 539, 580 [all 12 jurors with prior knowledge of the case]; *People v. Ramirez*, *supra*, 39 Cal.4th 398, 434 [11 jurors with prior knowledge of the case]; *People v. Bonin* (1988) 46 Cal.3d 659, 678, overruled on other grounds as recognized in *People v. Hill* (1998)17 Cal.4th 800, 823, fn. 1 [10 jurors exposed to media coverage of the case]; *People v. Leonard*, *supra*, 40 Cal.4th at pp. 1396-1397 [eight jurors with prior knowledge of the case].) "The relevant question is

---

**3** Defendant also points out that three jurors remained on the panel whom one might have expected the defense to dismiss with peremptory challenges for reasons unrelated to their knowledge of the case. Juror No. 134's cousin had been beaten to death, and her sister had been raped. The ex-husband of Juror No. 228 had killed his sister and was imprisoned. Juror No. 384, in addition to having extensive knowledge of the case (see text, *ante*), had been previously married to an Orange County deputy district attorney, had known the trial judge when he was an attorney in that same office, was the child of a police officer, and was dating an officer. She had had a close friend who was the victim of an unsolved murder years earlier. She stated that after Denise's disappearance, she went over "security" with her daughter and told her to stay in the car and rely on her cell phone if she found herself in a similar situation. The defense unsuccessfully exercised a challenge for *cause* against her.

not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant." (*Patton v. Yount*, *supra*, 467 U.S. at p. 1035.) Here, all 12 jurors testified under oath that they could put aside outside influences and fairly try the case. Although such assertions of impartiality do not automatically establish that the defendant has received a fair trial, "a review of the entire record of voir dire may still demonstrate that pretrial publicity had no prejudicial effect." (*People v. Howard* (1992) 1 Cal.4th 1132, 1168.) Here, our independent review of the record shows that the selection process resulted in a panel of jurors untainted by the publicity surrounding this case, and we see no evidence that any of them held biases that the selection process failed to detect.

### 3. Defendant's motion for a new trial

#### a. Facts

After the jury's penalty verdict, defendant filed a motion for a new trial, asserting that during trial the jury had been exposed to comments or views about the case that were expressed outside the courtroom and were prejudicial to defendant. He relied on declarations from three jurors: Jurors Nos. 219, 134, and 218.

Juror No. 219 declared that several coworkers were "a bit hostile" to him for being away from work for so long and that "maybe a half dozen comments" from coworkers expressed belief in defendant's guilt. He told his coworkers that he did not welcome their comments. During the trial, his 21-year-old daughter mentioned driving by the site of murder victim Denise's disappearance on the freeway and seeing flowers left there to commemorate the sixth anniversary of Denise's disappearance. The juror stated that this incident did not affect him "as a juror in any way."

Juror No. 134 declared that during trial, three of her coworkers told her to " 'Hang 'em' " and tried to read her "things from the newspaper on the case." She told them to stop and left.

Juror No. 218 stated that after the guilt phase verdict, she received "several unsolicited comments" from a person at work to " 'Hang 'em.' "

Defendant also submitted a newspaper article and an editorial cartoon published in the Orange County Register. The article, which appeared the day after the jury returned its guilt phase verdict, solicited readers to participate in a telephone poll asking, "Should Famalaro be executed?" The next day, the paper published the results: Of 1,312 responses, 99 percent chose death as the appropriate penalty. With regard to the cartoon, which appeared on the day the jury returned its penalty verdict, it mocked the defense for seeking mercy on defendant's behalf.

The trial court denied defendant's motion for a new trial, noting that before their selection the jurors had said they could be impartial, and mentioning the absence of evidence indicating that the media coverage had improperly influenced any of the jurors.

### b. Analysis

Defendant argues that the circumstances surrounding the trial, viewed as a whole, were so inflammatory as to create a presumption of prejudice. We disagree.

The United States Supreme Court has presumed prejudicial violations of due process in cases where the influence of the media was so pervasive as to render the trial " 'a hollow formality,' " "conducted in a circus atmosphere" or in "a courthouse given over to accommodate the public appetite for carnival." (*Murphy v. Florida* (1975) 421 U.S. 794, 799, quoting *Rideau v. Louisiana* (1963)

373 U.S. 723; accord, *Estes v. Texas* (1965) 381 U.S. 532; *Sheppard v. Maxwell* (1966) 384 U.S. 333; see also *People v. Leonard*, *supra*, 40 Cal.4th 1370, 1394-1395.)

None of those circumstances was present here. Although local media coverage was heavy during the trial, and a news report introduced into evidence states that spectators filled the courtroom's seats, the trial appears to have been conducted in a temperate and rational manner. The trial was far from "lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." (*Murphy v. Florida*, *supra*, 421 U.S. at p. 799.)

"A presumption of prejudice . . . attends only the extreme case." (*Skilling v. United States*, *supra*, ___ U.S. at p. ___ [130 S.Ct. at p. 2915].) Because this is not such a case, the presumption of prejudice does not apply here.

Defendant contends that even if the presumption of prejudice is inapplicable, the totality of circumstances, both before and during trial, demonstrates "a reasonable likelihood that a fair trial was not had" (*People v. Williams*, *supra*, 48 Cal.3d 1112, 1126). In evaluating this contention, we have independently reviewed the entire record, taking into consideration the proceedings pertaining to venue, the voir dire and the jury selected, the events at trial, and the declarations in defendant's posttrial motion for a new trial.

"Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record — among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty." (*Skilling v. United States*, *supra*, ___ U.S. at p. ___, [130 S.Ct. at p. 2918].) Here, the trial court determined before trial that even though the jurors had been exposed to pretrial publicity, as well as the

40

comments of coworkers and the comments of other prospective jurors, they nonetheless could fairly try the case. After trial, the court determined that defendant had received a fair trial, even though coworkers had urged three of the jurors to impose the death penalty and media coverage remained heavy throughout the trial (see pp. 39-40, *ante*). In conducting our independent review, we give substantial weight to each of these determinations by the trial court. After considering all of the evidence, we reject defendant's claim that there is a reasonable likelihood that he did not receive a fair trial.

## B. Failure to Conduct Individual Sequestered Jury Selection

Defendant argues the trial court abused its discretion when it refused his repeated requests for individual sequestered examination of prospective jurors during jury selection. (See *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80-81, superseded by statute as recognized by *People v. Waidla* (2000) 22 Cal.4th 690, 713; see also Code Civ. Proc., § 223 [abrogating *Hovey*'s requirement that jury selection in capital cases be individualized and sequestered].) Defendant contends the error violated his rights to a fair trial by an impartial jury and to a reliable penalty determination under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

In the trial court, defendant had argued that questioning the prospective jurors individually and outside the presence of the other prospective jurors was necessary to prevent the creation of bias among those prospective jurors who, unlike other prospective jurors, were unfamiliar with the case. He renews that argument on this appeal, claiming that the record of jury selection indicated that the prospective jurors were "exposed to a poisonous environment." He points to comments by some prospective jurors that defendant should "fry," and that they felt uncomfortable looking at, and breathing the same air as, defendant. He also

41

notes the remarks by some prospective jurors that they learned about the case by sitting through jury selection, and that their knowledge of the case had led them to believe in defendant's guilt, with death as the appropriate penalty.

Individual sequestered jury selection is not constitutionally required, and jury selection is to take place "where practicable . . . in the presence of the other jurors in all criminal cases, including death penalty cases." (Code Civ. Proc., § 223; see *People v. Lewis* (2008) 43 Cal.4th 415, 493.) Accordingly, in reviewing a trial court's denial of a defendant's motion for individual sequestered jury selection, we apply the "abuse of discretion standard," under which the pertinent inquiry is whether the court's ruling "falls outside the bounds of reason." (*Lewis*, at p. 494.) Group voir dire may be " 'impracticable when, in a given case, it is shown to result in actual, rather than merely potential, bias.' " (*Ibid*., quoting *People v. Vieira*, *supra*, 35 Cal.4th at p. 288.)

Here, the trial court did not abuse its discretion. True, during the unsequestered jury selection process it became apparent that some prospective jurors had prejudged defendant's guilt and believed he should be executed. But whenever a defendant is charged with a heinous crime that is widely publicized, potential jurors are likely to learn that some members of the community have prejudged the defendant's guilt and punishment. The trial court here acted within its discretion when it implicitly concluded that in this case exposure to such comments did not automatically impair the ability of all prospective jurors to fairly decide the case. The record reveals no incidence of a prospective juror's mention in the jury selection process of inadmissible evidence that would have prejudiced the defendant.

### III.  GUILT PHASE ISSUES

### A.  Claim of Instructional Error Concerning Concealment of Evidence

The trial court gave a modified version of CALJIC No. 2.06, which permitted the jury to infer consciousness of guilt from any attempts by defendant to conceal evidence, but the court cautioned that such "conduct is not sufficient by itself to prove guilt, and its weight and significance, if any," was for the jury to decide.  Defendant argues that this instruction denied him his rights under the federal Constitution's Sixth, Eighth, and Fourteenth Amendments to due process, a fair jury trial, and to a reliable jury determination on the issues of guilt as well as special circumstances and penalty.

Specifically, defendant asserts that, because the defense did not dispute the prosecution's claim that defendant killed Denise, this instruction created a constitutionally impermissible inference that because defendant hid Denise's body and possessions in an effort to avoid apprehension, the killing was first degree murder and the special circumstances allegations were true.  He argues that concealment of evidence is not relevant to a defendant's state of mind at the time of the killing, but only to his state of mind after the killing.  He also contends the instruction was impermissibly argumentative.  At trial, defendant failed to make these arguments.  We nevertheless address their merits, because claims of instructional error are reviewable on appeal to the extent they implicate a defendant's substantial rights.  (*People v. Prieto* (2003) 30 Cal.4th 226, 247; § 1259.)  But here defendant's claims lack merit.

As defendant admits, we have in the past rejected similar claims, concluding that CALJIC No. 2.06 is not argumentative (*People v. Jurado* (2006) 38 Cal.4th 72, 125), that it does not permit a jury "to draw irrational inferences about a defendant's mental state during the commission of the charged offenses"

43

(*ibid.*), and that it does not " 'direct or compel the drawing of impermissible inferences in regard thereto' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 667, quoting *People* v. *Crandell* (1988) 46 Cal.3d 833, 871).  Moreover, even though the instruction at issue does not specify the criminal charges to which it applies, it does not " 'assume the existence of evidence relating to each charge' " (*ibid.*), but merely allows the jury to decide, if evidence of concealment exists, what weight and significance it may have in the case.

Furthermore, we disagree that defendant's concealment of Denise's body and possessions was irrelevant to the first degree murder charge and the special circumstance allegations.  By hiding Denise's body in his freezer, defendant tried to conceal evidence that he had sodomized her and that he had bound and gagged her for the purpose of kidnapping.  Hiding Denise's body was also an attempt to conceal the fact that defendant had placed three layers of plastic bags over her head before bludgeoning her to death, a circumstance that supported an inference that defendant premeditated and deliberated before killing Denise.  And by putting labels of "Christmas" on boxes that contained no Christmas items but instead contained Denise's possessions, the bloody surgical gloves, the empty handcuffs box, the spare white plastic bags, the murder weapons, and the roll of duct tape used to tape Denise's eyes and mouth, defendant attempted to conceal evidence relevant not only to premeditation and deliberation of the killing, but also to the kidnapping special-circumstance allegation, and his sexual intent on the sodomy special-circumstance allegation.

Accordingly, the trial court did not err in instructing the jury under CALJIC No. 2.06.

44

**B. Claim of Instructional Errors Relating to the Standard of Proof**

Defendant argues he was denied due process of law because several standard CALJIC guilt phase instructions (CALJIC Nos. 2.01, 2.02, 2.21.2, 2.22, 2.27, 2.51, 8.20, and 8.83) had the effect of lowering the prosecution's burden of proving guilt beyond a reasonable doubt. Defendant acknowledges, however, that we have repeatedly upheld these instructions against such challenges. (*People v. Davis*, *supra*, 46 Cal.4th at pp. 616-617; *People v. Whisenhunt* (2008) 44 Cal.4th 174, 221; *People v. Noguera* (1992) 4 Cal.4th 599, 633-634.) We do so again here.

**C. Claim of Improper Instructions on First Degree Premeditated Murder**

The indictment alleged a "violation of Section 187 (a) of the Penal Code (MURDER), a FELONY" in that defendant "did willfully and unlawfully and with malice aforethought murder Denise Huber, a human being." It also alleged that defendant committed the murder while "engaged in the attempted commission and the commission" of the crimes of kidnapping and sodomy. Defendant contends the indictment did not actually charge him with, nor did it allege facts sufficient to establish, first degree murder. As a result, he claims, he was charged only with murder in the second degree, and the trial court erred in instructing the jury that it could convict him of first degree murder.

As defendant acknowledges, we have rejected identical contentions, holding that "a defendant may be convicted of first degree murder even though the indictment or information charged only murder with malice in violation of section 187." (*People v. Morgan* (2007) 42 Cal.4th 593, 616, citing *People v. Hughes* (2002) 27 Cal.4th 287, 368-370.)

According to defendant, the United States Supreme Court's decision in *Apprendi* v. *New Jersey* (2000) 530 U.S. 466 requires the indictment to

specifically plead first degree murder. In support, defendant quotes *Apprendi's* holding that " 'any fact (other than prior conviction) that increases the maximum penalty for a crime *must be charged in an indictment*, submitted to a jury, and proven beyond a reasonable doubt.' " (*Id.* at p. 476, italics added.)

We reject defendant's contention. It is highly doubtful that *Apprendi* has any effect whatever on pleading requirements. That case discussed, not the adequacy of the pleadings, but the facts whose existence a jury must find to have been established beyond a reasonable doubt. But even assuming, for the sake of argument, that *Apprendi* required that a fact *increasing* the maximum penalty must be pleaded with greater specificity than previously, it would not require greater specificity in pleading first degree murder, because the maximum penalty for first degree murder in the absence of special circumstances (life imprisonment) is not greater than the maximum penalty for second degree murder, which like first degree murder carries a maximum penalty of life imprisonment. (See *People v. Sengpadychith* (2001) 26 Cal.4th 316, 327.) Here, defendant was sentenced to death, a greater punishment than life imprisonment. But the special circumstance allegations that made him eligible for that penalty *were* specifically pleaded.

Finally, defendant contends the jurors should have been instructed that the crime of first degree murder requires unanimous agreement on a particular theory of first degree murder. We have in the past rejected identical contentions, and do so again here. (*People v. Morgan*, *supra*, 42 Cal.4th at p. 617.)

## IV. PENALTY PHASE

### A. Admission of Victim Impact Evidence

Defendant faults the trial court for allowing Denise's parents to testify at the penalty phase of trial, over his objection, on how the crimes affected their lives. He argues that because this evidence was inadmissible at the time of the

46

offenses, its admission at trial violated the prohibition against ex post facto laws contained in article I, section 10 of the federal Constitution, and article I, section 9 of the California Constitution.  We disagree.

Just weeks after defendant's crimes, the United States Supreme Court partially overruled its prior precedent and held that the Eighth Amendment to the federal Constitution "erects no *per se* bar" to the admission of victim impact evidence.  (*Payne v. Tennessee*, *supra*, 501 U.S. 808, 827; see *id.*, at p. 830 & fn. 2, overruling *Booth v. Maryland* (1987) 482 U.S. 496.)  Since then, we have repeatedly upheld the admissibility of such evidence as a circumstance of the crime under section 190.3, factor (a), and we have held that retroactively applying the high court's decision in *Payne v. Tennessee* does not violate the prohibition against ex post facto laws.  (*People v. Hamilton* (2009) 45 Cal.4th 863, 925-926; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1066; *People v. Brown* (2004) 33 Cal.4th 382, 395-396; see also *People v. Edwards* (1991) 54 Cal.3d 787, 835.) Nor does the high court's reaffirmance of ex post facto principles in *Carmell v. Texas* (2000) 529 U.S. 513 compel a different result.  (*People v. Brown*, *supra*, 33 Cal.4th 382, 394-395.)

Defendant contends the trial court had a duty to give, on its own initiative, this clarifying instruction concerning the victim impact evidence:  "Victim impact evidence is simply another method of informing you about the nature and circumstances of the crime in question.  You may consider this evidence in determining an appropriate punishment.  However, the law does not deem the life of one victim more valuable than another; rather, victim impact evidence shows that the victim, like the defendant, is a unique individual.  Your consideration must be limited to a rational inquiry into the culpability of the defendant, not an emotional response to the evidence.  Further, you must not consider in any way what you may perceive to be the opinions of the victim's survivors or any other

47

persons in the community regarding the appropriate punishment to be imposed." The first four sentences of this instructed were *suggested* by the Supreme Court of Pennsylvania (*Com. v. Means* (Pa. 2001) 773 A.2d 143, 158 [explaining that the suggested instruction "is not mandated"]); the last sentence is based on a New Jersey Supreme Court decision (*State v. Koskovich* (N.J. 2001) 776 A.2d 144, 177).

The claim lacks merit. The first two sentences of the proposed instruction — telling the jury that victim impact evidence pertains to the circumstances of the crime and may be considered in determining the appropriate punishment — are adequately covered by a standard instruction (CALJIC No. 8.85) given here. (*People v. Bramit* (2009) 46 Cal.4th 1221, 1245; *People v. Zamudio* (2008) 43 Cal.4th 327, 369.) The third and fourth sentences — telling the jury how to evaluate victim impact evidence — need not be given by the trial court on its own initiative (*Zamudio*, at p. 370) and are "incorrect in suggesting that a juror's 'emotional response' to the evidence may play no part in the decision to vote for the death penalty" (*id.* at p. 369).

We have not previously considered the fifth and final sentence of the proposed instruction, explaining that the views of members of the community and the victim's survivors about the appropriate punishment may not be considered. To the extent that this sentence would have told the jury in this case not to consider community views, it was unnecessary, because CALJIC No. 8.84.1, given here, told the jury not to be "swayed by public opinion or public feelings." To the extent that the sentence would have told the jury not to consider the views of the victim's survivors, we see no need for the trial court to explain this on its own initiative, because it is "not necessary to the jury's understanding of this case." (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 370.)

48

## B. Trial Court's Refusal to Admit Allegedly Mitigating Evidence

Defendant contends the trial court committed reversible error by refusing to admit hearsay testimony regarding a telephone conversation he had with his sister around the time of the crimes. We perceive no prejudicial error.

At the penalty phase of defendant's capital trial, his sister, Marion Thobe, described a telephone conversation she had with him in June 1991 (the month murder victim Denise disappeared) in which he was emotional and crying about an undisclosed matter that had happened to him years earlier. In an attempt to elicit the subject of this conversation, defense counsel asked Marion if defendant had ever mentioned being sexually molested by his brother, Warren. The prosecutor objected on hearsay grounds, and the trial court sustained the objection.

Later, outside the jury's presence, defense counsel made an offer of proof that Marion would testify that in the June 1991 telephone conversation defendant told Marion, for the first time, that Warren (his older brother) had molested him when they were children. Defense counsel asserted that the evidence was admissible for a nonhearsay purpose, explaining that because it showed that defendant was in a highly emotional state at the time of Denise's disappearance, it indicated that her killing had "affected him," once he realized having "committed this horrible act," and that he had begun trying to explore why he had killed her. This evidence, defense counsel argued, was crucial to rebut the prosecution's argument that Denise's murder was "an enjoyable experience" for defendant, and that he had kept her body in the freezer as a private trophy.

The trial court noted that Marion's testimony had already established defendant's emotional state during the 1991 telephone call and there were "other ways" for the defense to prove defendant's childhood molestation by his brother, Warren. It reaffirmed its ruling sustaining the prosecutor's objection to defense counsel's question.

Defendant argues that the trial court's ruling was erroneous, because it prevented him from showing that, shortly after murdering Denise, he became aware that the childhood sexual abuse he had suffered might have caused long-lasting emotional scars that ultimately triggered his homicidal conduct. He claims for the first time that the ruling violated his rights to due process and an individualized and reliable penalty determination under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and their counterparts in the California Constitution.

Defendant did not raise his state and federal constitutional claims at trial. (See *People v. Smithey* (1999) 20 Cal.4th 936, 995 ["defendant did not contend that the federal Constitution compelled admission of this hearsay testimony [at the penalty phase], and he may not do so for the first time on appeal"].) Even assuming he has not forfeited them because they merely restate, under alternative but similar legal principles and facts, claims "otherwise identical" to those that were properly preserved (see *People v. Partida* (2005) 37 Cal.4th 428, 436; *People v. Yeoman* (2003) 31 Cal.4th 93, 117), the claims lack merit, as explained below.

The defense proffered the excluded testimony that, in defendant's telephone conversation with Marion, defendant mentioned that his brother Warren had molested him when he was a child to show that defendant was emotionally distraught at killing Denise and was trying to understand how his experience as a molestation victim might have led him to kill her. Defendant is right that the testimony was not hearsay when offered for this purpose. But defendant never mentioned Denise during the conversation, so the defense's claim that the emotional distress he displayed in that conversation resulted from killing her was speculative. As a result, the conversation's probative value was at best minimal. Moreover, the portion of Marion's testimony about the conversation that the trial

court excluded pertained only to Warren's alleged molestation of defendant. That testimony could not be used to prove that the molestation had occurred — it would have been inadmissible hearsay if offered for that purpose — and defendant offered no other evidence that he had been molested. (Called as a defense witness, Warren denied molesting defendant.) For these reasons, the trial court did not abuse its discretion when it excluded Marion's testimony.

## C. Instruction on the Credibility of a Single Witness

At the penalty phase, the prosecution presented, as evidence that defendant had engaged in prior criminal acts involving the use or threatened use of force or violence (§ 190.3, factor (b)), testimony that defendant had falsely imprisoned Cheryl W. and Nancy R. The trial court correctly instructed the jury that it could consider this evidence against defendant only if it found beyond a reasonable doubt that he had committed the prior criminal acts. (See *People v. Robertson* (1982) 33 Cal.3d 21, 53-55.)

In addition, at defense counsel's request, the trial court also gave the jury a modified version of CALJIC No. 2.27, which read: "You should give the testimony of a single witness whatever weight you think it deserves. *Testimony by one witness which you believe concerning any fact is sufficient for the proof of that fact*. You should carefully review all the evidence upon which the proof of that facts depends." (Italics added.) This instruction, defendant now argues, violated his constitutional right to due process. He contends that the instruction's above italicized language might lead a juror to conclude that if the juror believed prosecution witnesses Cheryl W. and Nancy R., the juror could consider their testimony in aggravation without deciding whether defendant's criminal acts had been proven beyond a reasonable doubt. We disagree.

51

Although defense counsel at trial requested the now challenged instruction, the challenge is not forfeited under the invited error doctrine because "the record fails to show counsel had a tactical reason for requesting or acquiescing in the instruction." (*People v. Moon* (2005) 37 Cal.4th 1, 28.) Nevertheless, the claim is meritless. The instruction at issue, CALJIC No. 2.27, does not undermine the prosecution's burden of proof when, as here, other instructions have "made clear that the prosecution had the burden of proving every element of any criminal offense beyond a reasonable doubt." (*People v. Montiel* (1993) 5 Cal.4th 877, 941; *People v. Turner* (1990) 50 Cal.3d 668, 697.) Here the jury was specifically told that the prosecution bore the burden of proving any other criminal activity "beyond a reasonable doubt." (See CALJIC No. 2.90.) The record before us has no indication that the jury misunderstood the now challenged instruction or was otherwise misled about the prosecution's burden of proof. There was no error and, accordingly, we reject defendant's contention that the instruction violated his due process rights.

### D. Admission of Unadjudicated Conduct

Defendant challenges the admission of his unadjudicated false imprisonments of Cheryl W. and Nancy R., which were offered in aggravation under section 190.3, factor (b), as evidence of criminal acts involving the use of, or threat to use, force or violence. He claims evidence of these two incidents violated his constitutional rights to equal protection and due process of law, a fair and speedy trial by an unanimous and impartial jury, a presumption of innocence, effective confrontation of witnesses, effective assistance of counsel, and a reliable, nonarbitrary penalty decision. He challenges the facial constitutionality of section 190.3, factor (b), and he claims that the factor was unconstitutional as applied to his case. These claims lack merit.

52

Section 190.3, factor (b) is not unconstitutional for failing to require a separate jury to consider the truth of the unadjudicated conduct or for failing to require jury unanimity with respect to the conduct. (*Tuilaepa v. California* (1994) 512 U.S. 967, 977; *People v. Hawthorne* (1992) 4 Cal.4th 43, 76.) Nothing in either *Apprendi v. New Jersey*, *supra*, 530 U.S. 466, or *Ring v. Arizona* (2002) 536 U.S. 584 compels a different result. (*People v. Cox* (2003) 30 Cal.4th 916, 971-972, disapproved on other grounds by *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.) Here, defendant could not have been prosecuted for either of the two unadjudicated crimes because the applicable statute of limitations had lapsed as to each, but "neither remoteness nor the expiration of the statutory limitations period bars admission of a defendant's prior unadjudicated criminal activity for purposes of section 190.3, factor (b)" (*People v. Medina* (1995) 11 Cal.4th 694, 772; *People v. Koontz* (2002) 27 Cal.4th 1041, 1095).

### E.  Instruction on Aggravating and Mitigating Factors

Defendant argues that CALJIC No. 8.85, the standard jury instruction given here on statutory aggravating and mitigating circumstances, is constitutionally flawed in various respects. We have in the past rejected similar claims, and defendant presents no compelling reason to reconsider our prior decisions. Accordingly, we reject defendant's constitutional challenges contained in his claims that the instruction is vague, resulting in the arbitrary and capricious application of the death penalty (*People v. Earp* (1999) 20 Cal.4th 826, 899); that the instruction fails to instruct the jury which sentencing factors are mitigating, aggravating, or both (*People v. Lewis*, *supra*, 43 Cal.4th 415, 532); that the instruction fails to require the jury to return explicit findings as to any aggravating factors (*People v. Earp*, *supra*, 20 Cal.4th 826, 899); and that the instruction violates defendant's right to equal protection under the federal Constitution's

53

Fourteenth Amendment because it fails to require the same sentence review afforded to noncapital defendants (*People v. Morrison* (2004) 34 Cal.4th 698, 731).

### F. Instruction on Scope of Sentencing Discretion

Defendant argues that CALJIC No. 8.88, the standard instruction given on how to guide the jury in weighing aggravating and mitigating evidence, suffers from flaws that violate his rights under the federal Constitution's Sixth, Eighth, and Fourteenth Amendments. We have in the past rejected similar contentions, and defendant presents no compelling reason to reconsider these decisions. Accordingly, we here reject constitutional challenges contained in defendant's claims that the instruction is vague and ambiguous (*People v. Davenport* (1995) 11 Cal.4th 1171, 1231); that the instruction fails to ask the jury to decide whether a death sentence is "appropriate" (*People v. Lewis*, *supra*, 43 Cal.4th 415, 533); that the instruction does not instruct the jury to choose life imprisonment if the aggravating factors did not outweigh the mitigating ones or if mitigating factors outweighed the aggravating ones (*People v. Perry* (2006) 38 Cal.4th 302, 320); that the instruction does not tell the jury that it could impose a life sentence even if the aggravating factors outweighed the mitigating ones (*People v. Lewis*, *supra*, 43 Cal.4th 415, 533); and it does not inform the jury that neither party has a burden to establish the appropriateness or inappropriateness of the death penalty (*People v. Medina*, *supra*, 11 Cal.4th 694, 782).

### G. Miscellaneous Issues Concerning California's Death Penalty Law

Defendant challenges the constitutionality of California's death penalty law on various grounds, all of which we have in the past rejected. We see no reason request to reconsider those prior decisions. Accordingly, we reiterate those holdings:

54

The federal Constitution does not impose on the prosecution a burden of proof as to penalty, and the state need not prove beyond a reasonable doubt whether "aggravating circumstances exist, that the aggravating circumstances outweigh the mitigating circumstances, or that death is the appropriate penalty." (*People v. Lewis*, *supra*, 43 Cal.4th 415, 533.) Nor does the federal Constitution require that the jury be unanimous on which aggravating factors apply. (*People v. Davis*, *supra*, 46 Cal.4th 539, 628.) Nothing in the high court's decision in *Apprendi v. New Jersey*, *supra*, 530 U.S. 466, or its progeny, compels a different result. (*People v. Lewis*, *supra*, 43 Cal.4th 415, 534.)

There is no requirement that the trial court instruct the jury that life imprisonment without the possibility of parole is the presumed sentence unless proven otherwise. (*People v. Perry*, *supra*, 38 Cal.4th 302, 321.)

The trial court is not required to perform intercase proportionality review of other murder cases to determine whether a particular defendant's relative culpability warrants the death penalty. (*People v. Lewis*, *supra*, 43 Cal.4th 415, 538.)

Defendant contends that California's death penalty law violates international law. He further argues that it violates "international norms," because these norms at best permit a sentence of death only for "extraordinary crimes," whereas California, he asserts, imposes death as a "regular punishment." As we have done in the past, we reject these claims. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 834; *People v. Panah* (2005) 35 Cal.4th 395, 500-501.)

## H. Cumulative Error

According to defendant, the cumulative effect of the various errors that occurred at his trial requires reversal of his murder conviction and death sentence.

55

We have concluded, however, that there were no errors at trial; thus, there was no cumulative effect.

## V. DISPOSITION

The judgment is affirmed.

KENNARD, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
IKOLA, J.*

---

\*      Associate Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Famalaro
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S064306
**Date Filed:** July 7, 2011
_____

**Court:** Superior
**County:** Orange
**Judge:** John J. Ryan

_____

**Counsel:**

Michael J. Hersek, State Public Defender, appointment by the Supreme Court, Joel Kirshenbaum and Douglas G. Ward, Deputy State Public Defenders, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Douglas G. Ward
Deputy State Public Defender
221 Main Street, Tenth Floor
San Francisco, CA  94105
(415) 904-5600

Marilyn L. George
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-3038