Filed 1/23/15  P. v. Maldonado CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B252968 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA073111) |
| v. | |
| JESUS MALDONADO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hayden Zacky, Judge.  Affirmed as Modified.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle, Michael C. Keller and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

Believing that the mother of his children, F. G., was romantically involved with his friend, Florentino Reyes-Lucas, appellant Jesus Maldonado beat and

stabbed Lucas to death, and kidnapped and threatened to kill F.G. A jury convicted Maldonado of first degree murder (Pen. Code, § 187, subd. (a)), kidnapping (Pen. Code, § 207, subd. (a)), making criminal threats (Pen. Code, § 422, subd. (a)), and found true the allegation that he used a knife in the murder (§ 12022, subd. (b)(1)). The trial court sentenced him to state prison for 25 years to life on the murder charge, plus an additional year for the knife enhancement. The court imposed consecutive sentences of eight years for the kidnapping offense and eight months for the criminal threat.

Attacking the judgment of conviction on appeal, Maldonado contends that the trial court erred by: (1) not explaining to the jury that provocation reducing first to second degree murder need not meet the objective standard of provocation required to reduce murder to manslaughter, and (2) instructing the jury that it could consider uncharged acts of domestic violence against F.G. as tending to prove a propensity to commit the charged murder. We conclude that defendant forfeited his claim of instructional error regarding provocation, but in any event the instructions were correct. We also reject the related claim that counsel was ineffective for not requesting a pinpoint instruction. As for the instruction on uncharged domestic violence, we conclude that although the trial court erred in instructing the jury that domestic violence acts involving F.G. could be considered in determining whether defendant had a propensity to commit murder, the error was not prejudicial. Finally, Maldonado contends (and the Attorney General concedes) that he is entitled to one additional day of custody credit. We agree, order the judgment modified to so reflect, and otherwise affirm.

2

# BACKGROUND

I.     *Evidence at Trial*

Because Maldonado does not challenge the sufficiency of the evidence to support the convictions, we discuss the evidence adduced at trial only as necessary to contested issues in this appeal. We review the record in the light most favorable to the judgment, and "presume in support of the judgment the existence of every fact the trier [of fact] could reasonably deduce from the evidence. [Citation.]" (*People v. Lewis* (1990) 50 Cal.3d 262, 277.)

A.  *Relationship between Maldonado and the Two Victims*

Maldonado and F.G. had a 23-year relationship during which they lived together and had children together. They never married. F.G. described Maldonado as jealous and aggressive. They broke up in March 2011 when Maldonado left to be with another woman.[1]

Maldonado and Lucas came from the same town in Mexico and were lifelong friends. Maldonado had introduced F.G. to Lucas 17 years earlier. For a year before the charged offenses took place, the three of them worked together as a cleaning crew at a medical facility. They all continued to work together after Maldonado and F.G. broke up, until an incident at work (discussed further below) two weeks before Lucas was killed, when F.G. quit and Maldonado's brother Ramon filled in as the third member of the cleaning crew.

---

[1]    The "other woman" was the sister of Lucas.

B. *Uncharged Domestic Violence Acts*

### 1. *Valentine's Day 2009 Incident*

On the afternoon of February 14, 2009, Maldonado and F.G. had an argument because she refused to sue her boss after cutting her finger at work, and Maldonado accused her of cheating on him with her boss. F.G. left to go to a wedding party without Maldonado.

Maldonado showed up at the party drunk and angry. F.G. hailed a nearby taxi so that she could leave with her children. Because the taxi arrived so quickly, Maldonado said the taxi driver must be her lover who had been waiting for her outside. F.G. and her children got into the taxi and went home. Later that evening, Maldonado came home. F.G. locked herself in the bedroom with her three children. Maldonado was screaming for her to come out, and threatening to kill her. He hit the door with a baseball bat, leaving a hole in the door. F.G. jumped out the window and ran to a neighbor's house to hide. Their daughter M. called 911 and told the police that her father was going crazy and was trying to kill her mother.

### 2. *Choking Incident in Early March 2012*

After Maldonado and F.G. separated, Maldonado often harassed her at work, pushing and grabbing her, accusing her of being unfaithful, and calling her a whore and other names. During one shift at the medical facility in early March 2012, Maldonado made it clear that he wanted to get back together and asked F.G. why she stopped loving him. When she did not respond positively, he put both hands around her neck and began to choke her, but quickly stopped. F.G. did not go back to work there after this incident because she was afraid he would hurt her.

4

C. *Charged Crimes*

On the morning of March 22, 2012, F.G. went to work at her seamstress job. As she walked from the bus stop to work, she saw Maldonado sitting in his car, looking angry. He exited the car and walked with her to her work station. F.G. received a call on her cell phone, and Maldonado grabbed the phone and answered it in a high-pitched voice. F.G. took the phone back and saw that the call had come from Lucas, whom she had texted earlier that morning about attending a funeral wake for their mutual friend. Maldonado became extremely angry, called her a whore, and said she and Lucas were going to pay for it. He insisted that she go with him to find Lucas to ask why Lucas was calling her.[2] When they got to his car, he took a metal baton from the trunk and said that now he would find out what was going on. He tried to force F.G. into the car, pushing and shoving her and scraping her with the baton. As they struggled, he took her cell phone and she left and went back into her workplace.

Maldonado came back to her workstation a few minutes later, after having searched the text messages on her phone and found a message she had sent to Lucas about the wake. He began asking her what was going on between her and Lucas, and he threatened to kill both of them. He grabbed a small paring knife that F.G. kept at her workstation, pointed it at her, and forced her to leave with him. She got into his car, but after one block, when Maldonado stopped at a red light, she jumped out and ran away. Maldonado tried to block her path with his car, then parked and chased her on foot with a screwdriver in his hand. She jumped into a car full of women she did not know and begged them to help her because she was

---

**2**    F.G. maintained that she and Lucas were only co-workers and friends, and no evidence at trial suggested they had a romantic relationship.

5

about to get killed, and they sped away. She used one of the women's cell phones to call M. and told her that Maldonado was trying to kill her.

Maldonado arrived at F.G.'s home soon afterwards and told M. that he had seen F.G. with Lucas, and that they were not going to make a fool of him and were going to pay. M. left to go to her mother's work to try to find her. Maldonado arrived there separately and took M.'s phone from her. He threatened to kill F.G. and Lucas. M. called the police and told them that her father was trying to kill her mother.

The police met F.G. at her house and took her statement. After switching her phone line to a different phone (since Maldonado had taken her cell phone), she left and went to a cousin's home in San Bernardino to hide from Maldonado.

That evening, F.G. ignored repeated phone calls from Maldonado. At 3:00 a.m. the next morning, she received a call but did not answer. When she saw that the call had come from Lucas's phone, she called back, but instead of Lucas answering, it was Maldonado, who said "Hello, my love." She hung up, and he then called and texted her repeatedly from his own phone, but she never answered. In one text, he said he was going to find her. Another text from him read, translated from Spanish, "Whoever may mock me or make fun of me would die. And if you deceive me with other people, you know what awaits you because sooner or later, I find out. And now you will be at the wake together the way you had planned."

At approximately 10:00 a.m. on March 23, 2012, Maldonado telephoned M. and told her he was in Rosarito, Mexico. He told her to tell her mother to answer her phone, that she did not have to worry anymore and he was not going to do anything to her, because he had gotten someone else out of the way. She asked

6

him who, and he said it was Lucas. Laughing, he told her that even as Lucas was bleeding, he said, "I am your friend. I will never betray you."

That morning, Lucas was found dead, covered in blood, lying on the floor inside a locked utility room in the basement of the medical facility. Besides cuts, bruises and abrasions, Lucas had sustained 11 stab wounds, some of them as deep as six inches, four of them being potentially fatal wounds to the heart and lung.

There appeared to have been a struggle in the hallway, in which one or more persons were bleeding. A large amount of blood was spattered on the walls and the floors down 50 to 60 feet of a hallway. There were smeared, bloody handprints on the walls and two different sets of bloody shoe prints on the floor, one of which did not match Lucas' shoes. From the smeared handprints and the blood found in a mop bucket, it appeared someone had tried to clean up the crime scene. Blood found on Lucas's hand had a mixture of DNA from Lucas as well as from another person, and Maldonado could not be ruled out as that other contributor. In addition, Maldonado's DNA was found on a sample taken from Lucas's shoe as well as on a red-stained handle found near Lucas's body.

Still photographs taken from video surveillance at the medical facility from the night of March 22, 2012, showed the following. Lucas and Ramon arrived at work at 7:05 p.m., and Maldonado arrived at 7:20 p.m. All three men were working inside the facility. Shortly after midnight, Maldonado descended the stairs into the basement with a vacuum cleaner. Lucas descended into the basement a few minutes later. After Maldonado went up the stairs, he quickly descended again at 12:05 a.m. Approximately 15 minutes later, at 12:20 a.m., Maldonado left the facility holding a red biohazard bag, no longer wearing the jacket he had been wearing earlier. Lucas never left the building.

D.  *Maldonado's Testimony*

Maldonado admitted that he went to F.G.'s workplace on March 22, 2012, and while he was there he got angry upon realizing that Lucas had telephoned F.G. and that she had Lucas's number stored in her cellphone under a fake name. He also thought it was suspicious that F.G. had sent Lucas a text message earlier that morning, between 3:00 and 4:00 a.m., about a funeral. He asked F.G. what was going on between them and convinced her to come with him to find Lucas. She got out of the car abruptly, and he tried to follow her on foot but lost sight of her. When he went to look for F.G. at her home and then back at her workplace, he had an alteration with M. during which he slapped her and accused her of conspiring with her mother to keep secrets from him.

Still angry, he went home and started drinking at around 11:00 a.m. He drank approximately 10 beers in the afternoon before Ramon and Lucas showed up at his house at around 6:00 p.m. that evening so that he could drive them to work. Maldonado was still very angry, but he did not say anything to Lucas. When they got to work, the others went inside, but Maldonado went to buy more beer. He drank the beers, then returned to work, still feeling angry, but still did not confront Lucas.

The last place Maldonado had to clean that night was the basement. Shortly after he went down there, Lucas came down as well. Maldonado then went back upstairs to put the vacuum away, and then he returned to the basement to make sure everything was in order. Maldonado asked Lucas to explain why he had called F.G. Lucas called him a jerk, and questioned why Maldonado had a problem with Lucas being with F.G. when they had broken up. Lucas also said it should be fine for Lucas to be with Maldonado's wife, since Maldonado was with

his sister. Lucas was laughing and smirked at him as he confirmed his relationship with F.G.

Furious, Maldonado attacked Lucas with a mop in his hand, but Lucas grabbed the mob and hit him on the hand with the stick. They struggled and punched each other with their fists, and then Lucas hit him in the head with an aluminum pipe. Maldonado was bleeding and felt weak. He was afraid and angry at the same time. They struggled over the metal pipe until Maldonado was able to grab it and run to the kitchen with Lucas chasing him. Maldonado grabbed a knife next to the stove and he and Lucas struggled for control of it. Maldonado was able to keep control of it and he stabbed Lucas. Even after being stabbed, Lucas was still trying to grab the knife and Maldonado feared for his life. Maldonado continued to attack him with the knife until he fell to the floor. Maldonado was scared and panicked. He may have tried to clean up afterwards, but he does not remember. He does not remember locking Lucas's body in the supply closet and does not recall what he did with the knife.

He left with his brother, and although he was bleeding and in bad shape, he had to drive because his brother cannot drive. Although he usually drove Lucas home too, he does not remember if his brother asked where Lucas was. He got rid of the biohazard bag, went home, and changed out of his bloody clothes and shoes and threw them away. He then drove to Mexico, taking both F.G.'s and Lucas's cell phones with him. When he was arrested and returned to authorities in Los Angeles, he needed stitches for an open head wound, and he had a scar at the time of the trial.

## DISCUSSION

I.    *Provocation Instructions*

9

Maldonado contends that the trial court erred in not modifying CALCRIM No. 522 to clarify that while an objective standard of provocation applies to reduce murder to voluntary manslaughter, it does not apply to reduce first to second degree murder. We disagree.

As here relevant, the trial court instructed the jury with CALCRIM Nos. 520, 521, 522, and 570. CALCRIM No. 520 explained the requirement to find malice aforethought for first and second degree murder. CALCRIM No. 521 explained the elements of first degree willful, deliberate and premeditated murder, stating that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." CALCRIM No. 522 instructed that provocation may reduce murder from the first to the second degree, stating that if the jury concluded that Maldonado committed murder "but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter." CALCRIM No. 570 instructed as follows: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his/her reasoning or judgment; [¶] AND 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for heat of passion to reduce a murder to voluntary manslaughter, the

10

defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment. [¶] If enough time passed between the provocation and the killing for an ordinary person of average disposition to 'cool off' and regain his clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

As we explained in *People v. Jones* (2014) 223 Cal.App.4th 995, 1000-1001 (*Jones*) provocation can reduce first degree murder to second degree murder, and can reduce murder to manslaughter. "[A] subjective test applies to provocation as a basis to reduce malice murder from the first to the second degree: it inquires whether the defendant in fact committed the act because he was provoked. The rationale is that provocation may negate the elements of premeditation, deliberateness and willfulness that are required for that degree of the crime. [Citation.] But more is required to reduce malice murder to voluntary manslaughter. For that, an objective test also applies: the provocation must be so great that, in the words of CALCRIM No. 570, it 'would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.'" (*Ibid.*)

We held in *Jones* that CALCRIM Nos. 520, 521, 522, and 570 correctly state the law, and that absent a request for a pinpoint instruction regarding the standard of provocation required to reduce first to second degree murder, the trial court had no duty to make such a modification to the pattern instructions. (*Id.* at p. 1001.) Here, Maldonado made no request for a modification, and therefore, as in *Jones*, the issue is forfeited.

Even if the claim were not forfeited, we would reject it. As noted, in *Jones* we held that the same instructions given in the instant case are correct and not misleading: "They accurately inform the jury what is required for first degree murder, and that if the defendant's action was in fact the result of provocation, that level of crime was not committed. CALCRIM Nos. 521 and 522, taken together, informed jurors that 'provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation.' [Citation.] As the jury also was instructed [with CALCRIM No. 570], a reduction of murder to voluntary manslaughter requires more. It is here, and only here, that the jury is instructed that provocation alone is not enough for the reduction; the provocation must be sufficient to cause a person of average disposition in the same situation, knowing the same facts, to have reacted from passion rather than judgment. [¶] There was no error in giving these instructions." (*Jones, supra,* 223 Cal.App.4th at p. 1001.)

Maldonado contends the prosecutor's argument led the jury to believe that an objective standard of provocation applied to reduce murder from first to second degree. The record is to the contrary. In his closing argument, the prosecutor did not refer to the provocation. Rather, he argued that that the evidence demonstrated a premeditated plan by Maldonado to kill Lucas. In her closing argument, defense counsel primarily argued that Maldonado should be acquitted because he acted in

12

self-defense, or that at most he should be convicted of voluntary manslaughter based on imperfect self-defense. As a secondary line of argument, defense counsel argued that the murder should be reduced to voluntary manslaughter based on sudden quarrel or the heat of passion. Counsel argued that a rational person would have become enraged upon hearing his best friend make fun of him while admitting he was sleeping with the woman Maldonado loved. Counsel thus argued that if the jury did not acquit Maldonado on a self-defense theory, it should find him guilty of manslaughter, not murder.

Defense counsel never argued that the jury should find Maldonado guilty of second degree murder, as opposed to first degree, based on his subjective notion of provocation. Rather, she argued more generally that there was no basis for finding first degree murder because the evidence did not show a premeditated plan to kill Lucas.

In his rebuttal argument, the prosecutor made the comments that Maldonado cites on appeal as evidence that the jury was misled into believing that the objective standard of provocation applied to reduce first to second degree murder. But these arguments were in response to defense counsel's argument concerning voluntary manslaughter. The prosecutor argued that "this isn't sudden quarrel or heat of passion. . . . There's no provocation here. He comes here and he tells you about these statements that supposedly [Lucas] made. Ladies and gentlemen, when you view all of the evidence, I want you to think about how unreasonable those statements are. . . . [¶] When we talk about this adequate provocation, it's a reasonable person standard. It's not, let's take this hot headed, jealous, angry defendant and see what's reasonable for him. That's not the standard. The standard is provocation that would have caused a person of average disposition to act . . . rashly and without due deliberation. A person of average disposition would

13

not, upon seeing a text message regarding a funeral, or one telephone call, surmise that there is some kind of illicit affair going on. Especially between a childhood friend and an ex-spouse or girlfriend. Ex. They hadn't been together for a year. You also know this is how the defendant operates. He is jealous. He thinks [F.G.] is cheating with everybody. You know this. This is just how he is. This isn't about what would this defendant do. It's an average person. We know what this person did . . . [a]nd we know what he did because of his jealousy." The prosecutor concluded: "The defendant is a jealous and angry person. Because his ego is so great, it caused him to kill somebody. Nobody will make a fool of him. So now he is not a fool, but he is a murderer. And you, ladies and gentlemen, should find him guilty of first degree murder of Florentino."

In short, nothing in the argument of counsel reasonably might have misled the jury in its consideration of the evidence of provocation in determining whether defendant premeditated and deliberated the killing of Lucas.

Finally, we reject Maldonado's claim that his attorney was ineffective for not requesting a pinpoint instruction specifically explaining that the objective standard of provocation did not apply to reduce murder from first to second degree. Even had such an instruction been requested and given, it is not reasonably probable that a different result would have been reached. (*Strickland v. Washington* (1984) 466 U.S. 668, 697 (*Strickland*) [ "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."].)

Under the instructions as given (which, as we have noted, correctly stated the law), defense counsel was free to argue that defendant's conduct in the events leading up to the killing demonstrated that he did not deliberate or premeditate the murder. Defense counsel argued that point, but it was not the first, or even second,

14

line of defense – acquittal based on self-defense, or a conviction of manslaughter based on unreasonable self-defense, sudden quarrel, or heat of passion, were the primary theories. Thus, a pinpoint instruction on provocation reducing the degree of murder was of little significance in the defense approach to the case.

Moreover, there was overwhelming evidence of premeditation and deliberation. Maldonado repeatedly threatened to kill Lucas more than 12 hours before actually doing so. After driving Lucas to work, he waited until the two of them were alone in the basement at the end of their shift, outside the view of the surveillance cameras, and then stabbed him 11 times, including four deep wounds to the lungs and heart. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 421–422 [location of gunshot wounds in head or neck were circumstances in support of premeditation and deliberation finding].) He then attempted to cover up his crime afterwards, hiding the body and trying to clean up the blood, disposing of the murder weapon and his bloody clothes, and fleeing to Mexico. (See *People v. Famalaro* (2011) 52 Cal.4th 1, 36 [jury could infer consciousness of guilt consistent with a willful, premeditated murder from the defendant's attempts to conceal evidence]; *People v. Moon* (2005) 37 Cal.4th 1, 28 [evidence of flight was relevant to whether the defendant premeditated and deliberated].) Finally, the morning after, he laughingly told his daughter that he had taken care of Lucas. In light of this evidence, and the defense pursued at trial, it is not reasonably probable that had a pinpoint instruction on provocation reducing the degree of murder been given, a different result would have been reached. (*Strickland, supra,* 466 U.S. at p. 698.)

II.     *Prior Uncharged Domestic Violence Instruction*

Maldonado contends the trial court erred by instructing the jurors, over a defense objection, that they could consider evidence of prior uncharged domestic violence incidents involving F.G. to conclude that Maldonado had a propensity to commit the charged murder.[3]  Although we agree that the court erred, the error was not prejudicial.

A.     *Evidence Code Section 1109 and CALCRIM No. 852*

"Except as provided in . . . [Evidence Code] Sections 1102, 1103, 1108, and 1109, . . . evidence of specific instances of [defendant's] conduct . . . is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).)  With exceptions not applicable here, Evidence Code section 1109 (section 1109) provides that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] Section 1101 if the evidence is not inadmissible pursuant to Section 352." (§ 1109, subd. (a)(1).)  Section 1109 thus constitutes an exception to the general rule excluding evidence of prior acts to show a propensity to commit a later-charged offense. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 405; *People v. Brown* (2000) 77 Cal.App.4th 1324, 1334, fn. 6.)  "'The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases.  Not

---

**3**     Although the defense objected to the court instructing the jury that it could find from the evidence of prior domestic violence that Maldonado was likely to murder Lucas, the defense did not object to the jury being instructed that it could find from the domestic violence acts that Maldonado would be likely to commit *kidnapping and threats against F.G.*, as those two charged offenses were plainly domestic violence offenses.

16

only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked.'" (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1027–1028, quoting Assem. Com. on Public Safety, Rep. on Sen. Bill No. 1876 (1995–1996 Reg. Sess.) June 25, 1996, pp. 3-4.)

The trial court ruled that the prior uncharged domestic violence incidents were admissible under section 1109 to show that Maldonado had a predisposition to murder Lucas. The court further ruled that this other crimes evidence was not more prejudicial than probative under Evidence Code section 352. The court therefore instructed the jury with CALCRIM No. 852, the pattern instruction applying section 1109, as follows: "The People presented evidence that the defendant committed domestic violence that was not charged in this case. [¶] Domestic violence means abuse committed against an adult who is a person with whom the defendant has had a child. [¶] Abuse means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. . . . [¶] If the People have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit Murder, kidnapping, and criminal threats, or the lesser included offenses, as charged here. If you conclude

17

that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of Murder, kidnapping, and criminal threats, or the lesser included offenses.  The People must still prove each charge and allegation of every charge beyond a reasonable doubt."

The trial court thus instructed the jurors that if they determined that Maldonado committed the prior uncharged domestic violence, they could conclude that he was disposed to or inclined to commit domestic violence, and could also conclude that he was likely to commit murder.  However, for section 1109 to apply, the murder must have constituted an "offense involving domestic violence," as that term is defined in the statute.  (See *People v. Johnson* (2000) 77 Cal.App.4th 410, 420 [rejecting due process challenge to section 1109 in part because "section 1109 is limited to prior acts of domestic violence in prosecutions for domestic violence"].)  Section 1109, subdivision (d)(3) provides that "domestic violence" has the meaning set forth in section 13700 of the Penal Code, namely "abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship."  (§ 13700, subd. (b).)  None of those categories applies to Lucas.[4]

Section 1109, subdivision (d)(3) additionally provides that subject to a hearing conducted pursuant to section 352, "'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense."  The class of persons protected under Family Code section 6211 is slightly broader than the class protected by

---

[4]    In the instruction given to the jury, domestic violence was defined as abuse committed against an adult with whom the defendant has a child.  Although Maldonado and F.G. had a child together, Maldonado and Lucas clearly did not.

18

Penal Code section 13700. (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1234.) For instance, it includes "[a]ny other person related by consanguinity or affinity within the second degree." (Fam. Code, § 6211, subd. (f).) "Consanguinity" means a relation by blood, while "affinity" means relations by marriage. (Fam. Code, § 6205.) However, even under the broader categories of persons encompassed by Family Code section 6211, Lucas, the perceived boyfriend of F.G., does not qualify as a domestic violence victim. (See *Riehl v. Hauck* (2014) 224 Cal.App.4th 695, 700 [stepfather's abusive acts against child's father outside of the child's presence did not constitute "abuse" because father was not a protected person under Family Code section 6211]; *People v. Selga* (2008) 162 Cal.App.4th 113 [striking a stay-away order issued to protect the current boyfriend of a woman who was stalked by the defendant, her former boyfriend; even though the defendant had threatened the current boyfriend, he did not qualify as a protected person under Family Code section 6211].)

Thus, although Lucas' killing was interconnected by motive with the underlying domestic violence involving F.G., with whom Maldonado believed Lucas was having an affair, the killing itself did not fall within the statutory definition of domestic violence, and the permissive inference of propensity to commit murder did not apply. Thus, we conclude that the trial court erred in including murder among the offenses that the jury was permitted to find it likely that Maldonado committed, by virtue of his past acts of domestic violence.

B. *Lack of Prejudice*

Although the trial court erred in instructing the jury that prior uncharged domestic violence could be used as evidence of Maldonado's propensity to murder Lucas, the error was harmless, under either federal harmless error review pursuant

19

to *Chapman v. California* (1967) 386 U.S. 18, 24, which requires proof of harmlessness beyond a reasonable doubt, or under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, requiring reversal only if it "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."

First, the prior domestic violence incidents were relevant to show Maldonado's motive to murder Lucas, and thus were properly admitted for that purpose under Evidence Code section 1101, subdivision (b). (§ 1101, subd. (b) ["Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as *motive*, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, . . . .) other than his or her disposition to commit such an act." italics added].) Indeed, the trial court expressly found that even if the prior uncharged acts were not admissible under section 1109 as evidence of Maldonado's propensity to commit the murder offense, they were admissible under section 1101, subdivision (b) as to his motive to kill Lucas. Without any objection from the defense, the jury was instructed that it could consider the uncharged acts on the issue of Maldonado's motive to commit murder and the other two offenses.

These prior acts tended to show that Maldonado believed that F.G. was unfaithful and did not take it well when she spurned him, even after he had left her for another woman. In the 2009 incident, after Maldonado accused F.G. of having an affair with a random taxi driver, he threatened to kill her and knocked a hole in her bedroom door with a metal bat as he tried to get to her. In the second incident in early March 2012, when F.G. rebuffed Maldonado's advances and efforts to reconcile with her, he choked her. These incidents supported the prosecution's theory that Maldonado's extreme and irrational jealousy motivated him to kill

20

Lucas, whom he believed had begun a romantic relationship with F.G. Regardless of the error in including murder among the offices listed in CALCRIM No. 852, the jury could properly consider the uncharged offense evidence of motive for the purpose of determining whether defendant acted willfully, deliberately and with premeditation, driven by his jealousy.

Second, Maldonado admitted that he stabbed Lucas to death. Given this admission, jurors did not need to resort to inferences that Maldonado had a propensity to commit homicide. Maldonado's admission that he killed Lucas makes it a moot point whether he was disposed to or likely to kill Lucas.

Third, nothing in the instruction at issue authorized the jury to find Maldonado guilty of murder based solely on his propensity to commit crimes of domestic violence and murder. Rather, the instruction provided that a propensity based on the prior domestic violence was only one factor to consider along with all the other evidence, and it was not sufficient by itself to prove that Maldonado was guilty. The instruction reminded the jury that the People bore the burden to prove each charge beyond a reasonable doubt. We presume the jury followed the court's instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 662.) No reasonable juror would have believed that the requirements of the crime of first degree murder could be satisfied solely by evidence of the uncharged offenses against F.G.

Fourth, as already discussed, the evidence that Maldonado committed premeditated murder was overwhelming. Thus, considered under either the *Chapman* or *Watson* standard, Maldonado was not prejudiced by the erroneous instruction regarding the permissible inferences from the evidence of uncharged domestic violence.

21

III.  *Custody Credits*

Maldonado argues, and the Attorney General concedes, that he is entitled to one additional day of presentence custody credit.  The trial court credited him with 606 days in actual custody, apparently relying on the Probation Report which lists the date of arrest as March 24, 2012.  However, the trial record and body of the probation record show that he was arrested on March 23, 2012.  A defendant is entitled to custody credits both for the day of arrest and the day of sentencing and all days in between.  (*People v. Browning* (1991) 233 Cal.App.3d 1410, 1412.)  Because the time from March 23, 2012 to and including November 19, 2013 amounts to 607 days total, Maldonado is entitled to 607 days of custody credit, rather than 606.

## DISPOSITION

The judgment is modified to give Maldonado credit for an additional day of presentence custody, for a total of 607 days. The trial court is directed to amend the abstract of judgment accordingly and to forward a copy thereof to the Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.

COLLINS, J.

22